Samuel LeMAIRE, Petitioner–Appellee,

v.

Manfred MAASS, Superintendent, Respondent–Appellant.

Samuel LeMAIRE, Plaintiff–Appellee,

v.

Manfred MAASS, Superintendent, Defendant–Appellant.

Nos. 91–35249, 91–35557.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 15, 1992.

Submission Withdrawn Oct. 28, 1992.

Resubmitted June 18, 1993.

Opinion July 21, 1993.

Amended Aug. 13, 1993.

As Amended on Denial of Rehearing and Suggestion for Rehearing En Banc Dec. 23, 1993.

Rives Kistler, Asst. Atty. Gen., Salem, OR, for the respondent-defendant-appellant.

Spencer M. Neal, Ginsburg, Gomez & Neal, Portland, OR, for petitioner-plaintiff-appellee.

Before BEEZER, NOONAN, and TROTT, Circuit Judges.

## ORDER

Judge Trott's majority opinion filed on July 21, 1993, and refiled on August 13, 1993 with Judge Noonan's amended dissent, is, with Judge Beezer's concurrence, ordered amended as reflected in the attached Amended Opinion. Judge Noonan's amended dissent filed August 13, 1993 continues to apply to Judge Trott's Amended Opinion.

With the Amended Opinion, Judges Beezer and Trott have voted to deny the petition for rehearing and to reject the suggestion for rehearing en banc. Judge Noonan has voted to grant the petition for rehearing and to accept the suggestion for rehearing en banc.

The full court was advised of the suggestion for rehearing en banc. An active judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed.R.App.P. 35.

The petition for rehearing is DENIED and the suggestion for rehearing en banc is REJECTED.

## OPINION

TROTT, Circuit Judge:

Samuel LeMaire is suing the Superintendent of the Oregon prison in which he is incarcerated. He alleges he has been subjected to practices and conditions that violate his constitutional rights, referring primarily to the Eighth Amendment's prohibition of cruel and unusual punishment. LeMaire substantially prevailed in the district court. The Superintendent timely appeals. We have jurisdiction under 28 U.S.C. § 1291, and we reverse and remand for further proceedings consistent with this opinion.

### I

The Oregon Department of Corrections maintains the Oregon State Prison ("OSP"). Within the OSP, there is a special facility called the Disciplinary Segregation Unit ("DSU"), the purpose of which is to house separately certain inmates who have been found, in accord with published procedural requirements, to have violated Department of Corrections' Rules on Inmate Prohibited Conduct. The DSU consists of ninety cells in a three-tiered edifice separate from the main OSP building. The DSU "is the maximum control unit inside the institution housing inmates who pose a threat to the security, control and good order of the institution." Security Post Order # 34, 6 June 1989. "Normally inmates are placed in disciplinary segregation status for a rule violation only after a hearing by the Disciplinary Committee or disciplinary adjudicator." Or.Admin.R. 291–11–025(1). Currently, the maximum time an inmate may spend in the DSU at one stretch is 180 days. As the record demonstrates, and as the district court observed, the DSU serves to separate "disruptive and dangerous inmates from the general prison population" where the rules are less restrictive. It is apparent from the record that the inmates assigned to the DSU would, if left in the general prison population, make it next to impossible to manage that part of the penitentiary without considerably tightening up the rules and regulations to the discomfort and detriment of those prisoners not disposed to misbehave.

The district court described the behavior of prisoners in the DSU as a "nightmare," where staff work under "the constant threat of unpredictable assaults and bombardment with feces, urine, spit, food, and any available movable object." Moreover, as the district court observed in its opinion, "DSU inmates are violent and dangerous not only to staff, but to each other," so much so that "[t]o simply let them out in an exercise yard in groups could make defendant [Superintendent Maass] vulnerable to charges of deliberate indifference to the personal safety of inmates."

Samuel LeMaire is the sole plaintiff in this case. He is serving a life sentence in the OSP for a murder he committed in 1985, in which he killed his victim by slitting his throat. He is 5′9″ tall and weighs between 250–280 pounds. LeMaire has been repeatedly held in the DSU as a result of numerous egregious violations of prison rules too numerous to recount in detail. Thus, we only highlight a representative number suffi-

cient to paint a picture of the havoc for which he has been responsible.

LeMaire arrived at the penitentiary on January 2, 1986. On February 19, 1986, only a month and a half after his matriculation, LeMaire attacked a prison guard, Sergeant Dahl. LeMaire was subdued and taken immediately to the DSU. Later, he told another inmate he would "get Sgt. Dahl. I don't care if they give me six months to a year. I don't care, I am doing life anyway." After a hearing at which LeMaire admitted the attack, he was removed from the general population and ordered housed in the DSU from February 19, 1986 through November 18, 1986. By LeMaire's own admission at the hearing, the attack had been planned, and the hearing officer specifically found that LeMaire intentionally inflicted injury on Sergeant Dahl.

On November 28, 1986, just 10 days after the expiration of his stay in the DSU, LeMaire savagely attacked a fellow inmate in the Industries Dormitory with a 10–12 inch brass rod sharpened to a point at one end with masking tape on the other as a handle. LeMaire stabbed his victim twelve to fourteen times. LeMaire's stated intent as found by a hearing officer was to kill the inmate because he was a "snitch" and a "child molester." To quote the plaintiff from the hearing officer's report, "I bit [sic] the fucking snitch rapo. I'm going to the hole a long time this time, especially if the snitch doesn't make it. I gave it my damednest, after I stuck him a couple of time [sic], he was still moving though, after I bit him I should say." LeMaire also said that he approached his victim "wanting to go for his spine." LeMaire's attack was so single-minded that he sustained it for 2–3 minutes after being observed by guards and verbally ordered to stop.

At the disciplinary hearing convened to deal with this incident, LeMaire admitted the assault with a weapon and was assigned again to the DSU from November 28, 1986 through November 27, 1987. Based on LeMaire's record, Superintendent Maass made a finding in writing dated January 14, 1987 that "LeMaire represents a serious threat to the safety and well-being of others within the Oregon State Penitentiary." The superintendent's assessment is fully supported by the record and borne out by subsequent events.

A review of LeMaire's meticulously documented behavior in the DSU, and the Findings of Fact, Conclusions, and Recommendations of numerous disciplinary hearings convened to cope with this behavior, explains the district court's description of the general situation created in that unit by the inmates as a "nightmare." This review also provides us with the full dimensions of the security and disciplinary problems LeMaire represents to the penitentiary and the DSU, and it shows us in great detail how staff and administrators dealt with him. For example, on January 5, 1987, LeMaire refused to give up his tray after the morning meal. When ordered to give it up, he balked and said, "If you want it mother fuckers come and get it, I'm ready for you." He then assaulted corrections officers with hot water, toilet water, and food, while intermittently banging the tray on the bars, causing the rest of the tier to do the same. To restore order, LeMaire was maced. When his cell door was opened, he charged out of his cell and rammed his head into an officer's chest. For this incident, LeMaire's stay in DSU was extended as recommended by a hearing officer and approved by the Superintendent.

Skipping over numerous episodes wherein LeMaire assaulted officers with urine and feces, we move to an incident demonstrating LeMaire's behavior when he is permitted to engage in outdoor activities or interact with other inmates. On June 18, 1987, LeMaire attacked a fellow inmate while in the DSU recreation yard. He refused verbal orders to stop and did not disengage until a shot was fired from a guard tower into the grass. As a result of a disciplinary hearing on July 8, 1987, his stay in the DSU was again extended, and his DSU yard privileges were curtailed for two months. The recommendation issued by the hearing officer noted that it "would certainly appear that other sanctions have been proven inadequate in curtailing Inmate LeMaire's assaultive misconduct within the penitentiary."

LeMaire then resumed his relentless assaults on officers and other inmates using feces and urine as his primary weapons. These assaults are documented in the record. For example, on November 9, 1988, he threw feces on a lieutenant. He later asked the lieutenant "if that shit tasted good," noting that he "mixed it up special" for him. LeMaire said, "I know I got you in the mouth. It was chunky, too." On January 26, 1989, a hearing officer noted that the disciplinary incident under review "represented Inmate LeMaire's 25th major rule violation within a two-year period." Accordingly, LeMaire was placed in segregation status for one month as recommended by the hearing officer and approved by the Superintendent.

LeMaire's episodic but nonetheless predictable misconduct rarely abated. On February 1, 1989, officers tried to move him from one cell to another. He refused and threw feces on one of the officers. He then attacked a cell extraction team sent to remove him, injuring two officers in the process. After he was afforded a hearing, he was once again placed in segregation. Beginning on April 11, 1989, LeMaire was freed of all DSU behavior control procedures and enjoyed normal DSU out-of-doors exercise privileges. On August 14, 1989, however, LeMaire was working out in an exercise cubicle. When he was finished, he shoved the cubicle door in one officer's face and attacked both of them with a five and a half-inch homemade knife. He cut one of the officers twice on the head. Later that evening, LeMaire stated with respect to this attack, "The next time I do it, I won't make a mistake. I'll do it right." Because of this incident and LeMaire's implied threat to repeat his attack, his out-of-cell exercise privileges were suspended for two months.

The record amply demonstrates that, sadly, LeMaire is a violent and dangerous person who has no regard for other human beings. He was evaluated on January 17, 1990 by Dr. Edward Colbach, a psychiatrist, and diagnosed as having an antisocial personality complicated by "an intermittent explosive disorder." LeMaire stated to Dr. Colbach that "he isn't sure he really is a fit candidate for the general population," and

that on occasions, "something comes over him and he goes into a rage for no clear reason." LeMaire said, however, that on other occasions, he plans to "get back at someone for something," and he "plans the rage."

LeMaire's rages, planned or otherwise, and his intractable penchant for violence are well illustrated by an incident that occurred on February 19, 1990, just 10 days after he testified in this case. Notwithstanding LeMaire's awareness from his appearance before the district court of what was at stake in this lawsuit, he threw two full cups of feces on an officer's head. He was then placed in handcuffs and leg irons in preparation for removal from his cell, but restraints notwithstanding, he used his body to slam an officer's head into a wall. LeMaire then told the slammed officer in the presence of others, "You're the next victim I'm going to stick." Taking into account the crime for which he was sentenced to prison as well as his behavior while incarcerated, it takes no imagination to understand this as a serious death threat to a member of the OSP staff.

## II

### A.

LeMaire brought this action against Manfred Maass, the Superintendent of the OSP. His purpose was to seek an injunction against certain standard practices of the DSU which had been applied against him in response to various aspects of his violations of prison rules, as partially outlined in Part I. In particular, LeMaire's complaint alleges that six practices of the DSU violate the Constitution's prohibition of cruel and unusual punishment, as well as the requirement that all persons be afforded due process of law in connection with infringements of their liberty interests. He singles out the following sanctions which have been used on various occasions to try to control him as violating his Eighth and Fourteenth Amendment rights:

1. The use of Nutraloaf as part of a controlled feeding status designed to control inmates who throw or misuse food or human waste, or who fail to return meal

trays or eating utensils. Or.Admin.R. 291–83–015(1).

2. The use of restraints on inmates judged to be dangerous while such inmates take showers.

3. The measured curtailment of out-of-doors exercise privileges for inmates who violate prison rules.

4. The temporary placement of disruptive inmates in illuminated "quiet cells," which isolate them from other inmates and officials.

5. The use of in-cell restraints for out of control inmates when their behavior, if unrestrained, could (1) result in major property destruction, (2) constitute a serious hazard to the inmate's health or that of other inmates, or (3) escalate into a major disturbance. Or.Admin.R. 291–13–035(2)(a).

6. The removal of a prisoner's clothing if the clothing is being misused in violation of prison regulations and policy, e.g., to block toilets, start fires, etc. Or.Admin.R. 291–11–064.

After a trial, the district court made the following determinations.

1. The use of Nutraloaf for up to seven days as a sanction for misbehavior violates the Eighth Amendment. Moreover, the use of Nutraloaf "for misconduct not directly related to the misuse of food or utensils, and which cannot be curbed by the use of Nutraloaf, is a due process violation."

2. The use of full mechanical restraints on inmates while they shower violates the Eighth Amendment.

3. The deprivation of plaintiff's out-of-doors exposure and exercise opportunities violates the Eighth Amendment.

4. The use of closed-door constantly illuminated "quiet cells" violates the Eighth Amendment.

5. The holding of a disruptive inmate in his cell in full mechanical restraints until "it is reasonable to believe that the behavior leading to the use of the restraints will not immediately resume," Or.Admin.R. 291–13–035(2)(c), violates the Eighth Amendment.

6. The removal of clothing and other personal property from disruptive inmates until they earn them back by demonstrating good behavior violates the Eighth Amendment.

The district court entered an injunction in favor of LeMaire in order to remedy the violations it found. The court (1) prohibited the general punitive use of Nutraloaf, allowing its use only when an inmate misuses food or eating utensils, and then only for two meals; (2) prohibited the use of in-shower restraints; (3) ordered that in-cell restraints be used no more than two hours without psychiatric authorization, and only when an inmate is likely to harm himself; (4) limited the use of "strip status" to an inmate's misuse of bedding or personal property and required psychiatric authorization for the placement of an inmate on "strip status" for more than two hours; (5) required that all inmates be given the opportunity to exercise outside their cells several times per week and limited the punitive removal of exercise privileges to one month; and (6) required that the solid doors of "quiet cells" be left open at all times, and an intercom be installed to facilitate contact between guards and inmates in these cells.

The district court determined that Le-Maire was a "prevailing party" and, pursuant to 42 U.S.C. § 1988, initially awarded Le-Maire attorneys' fees in the amount of $93,722. This amount had been increased by the court's application of a 1.33 multiplier. Le-Maire later requested and was awarded additional attorneys' fees in the amount of $17,230.50 for additional work done after the period covered by the initial award, for work inadvertently omitted in the initial request for award, and miscellaneous expenses.

Although LeMaire is the sole plaintiff in this lawsuit, by stipulation of the state the court's injunction applies to all persons similarly situated. Because of the state's stipulation, no class was certified.

### B.

We defer to the findings of fact of a district court unless they are clearly erroneous. Fed.R.Civ.P. 52(a). A finding of fact is not

clearly erroneous "unless the record leaves us with a definite and firm conviction that a mistake has been made." *Hoptowit v. Ray,* 682 F.2d 1237, 1245 (9th Cir.1982) (citing *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948)). We "freely review" a district court's conclusions of law. *Id.* As to injunctive relief, a district court has "broad discretion to fashion remedies once constitutional violations are found," but we may reverse if we determine that the relief ordered constitutes an abuse of discretion. *Id.* at 1245–46.

## III

After the district court rendered its initial opinion on August 3, 1990, the Supreme Court decided certain key Eighth Amendment cases that refine the test we apply to claims that prison conditions and practices violate the Eighth Amendment. In particular, we refer to *Wilson v. Seiter,* —— U.S. ——, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) and *Hudson v. McMillian,* —— U.S. ——, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). These cases were known by the attorneys for the parties prior to oral argument and were extensively discussed in court. Unfortunately, our able colleague on the district court did not have the benefit of these decisions when he decided this case. Thus, he did not focus sufficiently on a critical issue: the state of mind of the accused officials in connection with each alleged violation. However, the district court has provided us with an excellent and complete factual record which permits us to decide this appeal based on recent clarification of the controlling law. In this respect, we agree with LeMaire's counsel's representation at oral argument that remand on the underlying issues is unnecessary. Thus, we proceed to a discussion of the law that controls this case.

### A.

■ In *Wilson,* the Supreme Court made it clear that an Eighth Amendment violation cannot exist without a culpable state of mind on the part of the person responsible for the deprivation. Referring to relevant precedent, including *Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986),

Justice Scalia said that "[t]hese cases mandate inquiry into a prison official's state of mind when it is claimed that the official has inflicted cruel and unusual punishment." *Wilson,* —— U.S. at ——, 111 S.Ct. at 2324. In so doing, the court emphasized that there are two parts to the test of whether an alleged deprivation is cruel and unusual punishment. The first part of the test is objective: Was the deprivation sufficiently serious? The second part is subjective: Did the officials act with a sufficiently culpable state of mind? *Id.*

■ Preliminarily, we note that the district court focused, in its own words, "to the maximum extent possible on objective factors" in connection with "evolving standards of decency that mark the progress of a maturing society," quoting *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 597, 2 L.Ed.2d 630 (1958). The district court's opinion contains no specific findings of fact or conclusions whatsoever as to the requisite state of mind of the officials accused by LeMaire. Instead, each practice or sanction was judged on what the district judge perceived to be its penological merits. It is in this objective sense that the court condemns various *practices* as demonstrating deliberate indifference. The absence of precise findings or conclusions as to the Superintendent's state of mind undercuts the validity of the court's ultimate conclusions regarding the Eighth Amendment.

### B.

■ LeMaire's allegations relate to "deprivations that were not specifically part of [his] sentence but were suffered during imprisonment." *Wilson,* —— U.S. at ——, 111 S.Ct. at 2323. As such, to be actionable under the Eighth Amendment, these deprivations must satisfy not only the objective component of the relevant test, i.e., was the deprivation sufficiently serious, but also the subjective component, i.e., was the offending conduct *wanton. Id.* at ——, 111 S.Ct. at 2324. The second part of the test, as we have indicated, mandates an examination of the state of mind of the person imposing the deprivation, and that part of the test is not satisfied unless the pain which has been in-

flicted is both "unnecessary and wanton." *Jordan v. Gardner,* 986 F.2d 1521, 1525 (9th Cir.1993) (en banc). " 'It is obduracy and wantonness ... that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause.' " *Id.* at 1527 (quoting *Whitley,* 475 U.S. at 319, 106 S.Ct. at 1083). *Whitley* makes clear, however, that in this context wantonness does not have a fixed meaning but must be determined with "due regard for differences in the kind of conduct against which an Eighth Amendment objection is lodged." Where (as in *Whitley* ) officials act in response to a prison disturbance, their actions are necessarily taken "in haste, under pressure," and balanced against "competing institutional concerns for the safety of prison staff or other inmates." In such an emergency situation, we found that wantonness consisted of acting " 'maliciously and sadistically for the very purpose of causing harm.' " In contrast, "the State's responsibility to attend to the medical needs of prisoners does not ordinarily clash with other equally important governmental responsibilities," so that in that context, as *Estelle* held, "deliberate indifference" would constitute wantonness.

The parties agree (and the lower courts have consistently held) that the very high state of mind prescribed by *Whitley* does not apply to prison conditions cases. Petitioner argues that, to the extent officials' state of mind is relevant at all, there is no justification for a standard more demanding than *Estelle's* "deliberate indifference." Respondents counter that "deliberate indifference" is appropriate only in "cases involving personal injury of a physical nature," and that a malice standard should be applied in cases such as this which "do not involve ... detriment to bodily integrity, pain, injury, or loss of life."

We do not agree with respondents' suggestion that the "wantonness" of conduct depends upon its effect upon the prisoner. *Whitley* teaches that, assuming the conduct is harmful enough to satisfy the ob-

jective component of an Eighth Amendment claim, whether it can be characterized as "wanton" depends upon the constraints facing the *official.*

*Wilson,* —— U.S. at ——, 111 S.Ct. at 2326 (citations omitted). Thus, we must decide which of the two meanings of wantonness applies to this case.

First, LeMaire does not claim that the Constitution prohibits the maintenance by a state penitentiary of a special unit designed to deal with incorrigible and dangerous rules offenders such as LeMaire.[1] Moreover, he cites no reason why he should not be housed there. The context of disciplinary segregation raises considerable "constraints facing the official." Second, this case involves responses by responsible officials at the OSP and the DSU to violations by an inmate of legitimate and properly established prison rules of conduct. The rules violated by LeMaire entail, without a doubt, honest security concerns at OSP. As the Supreme Court has noted: " '[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves.' " *Bell v. Wolfish,* 441 U.S. 520, 546–47, 99 S.Ct. 1861, 1877–78, 60 L.Ed.2d 447 (1979) (quoting *Pell v. Procunier,* 417 U.S. 817, 823, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974)). The "kind of conduct" against which LeMaire lodges his Eighth Amendment objections, *Wilson,* —— U.S. at ——, 111 S.Ct. at 2326, is conduct designed by prison administrators to maintain control over rebellious inmates.

We conclude in this case that the security constraints confronting Superintendent Maass are considerable, and that the "wantonness" that must be established consists of acting "maliciously and sadistically for the very purpose of causing harm." *Whitley,* 475 U.S. at 320–21, 106 S.Ct. at 1084–85. What LeMaire complains of are not so much conditions of confinement or indifference to his medical needs which do not clash with important governmental responsibilities; instead, his complaint is levelled at measured practic-

---

1. Although state law may create certain due process rights in the procedure by which an inmate is placed in administrative segregation, *Conner v. Sakai,* 994 F.2d 1408, 1410 (9th Cir.1993), Le-

Maire has not questioned the administrative process which resulted in his separation from the general prison population.

es and sanctions either used in exigent circumstances or imposed with considerable due process and designed to alter LeMaire's manifestly murderous, dangerous, uncivilized, and unsanitary conduct. In our view, and as we explain in Part IV of this opinion, each of these security and disciplinary sanctions is reasonably necessary to control inmates in the OSP and the DSU.

Our selection of the heightened state of mind referred to in *Wilson* as controlling is informed by (1) the purpose of the DSU, (2) the purpose of the rules and regulations broken by LeMaire, and (3) the purpose of the sanctions applied to him for his misconduct. In each instance, the purpose is the same: to maintain and restore discipline in the OSP. When this compelling purpose is viewed in the light of the Supreme Court's reasoning in *Whitley,* the choice of standards is clear.

Where a prison security measure is undertaken to resolve a disturbance, such as occurred in this case, that indisputably poses significant risks to the safety of inmates and prison staff, we think the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the purpose of causing harm.

... Prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. *That deference extends to a prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventive measures intended to reduce the incidence of these or any other breaches of prison discipline.* It does not insulate from review actions taken in bad faith and for no legitimate purpose, but it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice.

*Whitley,* 475 U.S. at 320–22, 106 S.Ct. at 1084–86 (emphasis added) (citations and quotations omitted).

The Court visited this issue again in *Hudson* under circumstances where a riot or major disturbance was *not* involved. Hudson was a Louisiana state prison inmate who allegedly had been punched and kicked by two corrections security officers ostensibly because he argued with them. *See Hudson v. McMillian,* 929 F.2d 1014 (5th Cir.1990). Unmoved by the absence of an emergency or a major disturbance, the Supreme Court said:

Many of the concerns underlying our holding in Whitley arise whenever guards use force to keep order. Whether the prison disturbance is a riot *or a lesser disruption,* corrections officers must balance the need "to maintain or restore discipline" through force against the risk of injury to inmates. Both situations may require prison officials to act quickly and decisively. Likewise, both implicate the principle that "[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" (citations omitted) In recognition of these similarities, we hold that *whenever* prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishment Clause, the core judicial inquiry is that set out in Whitley: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.

*Hudson,* —— U.S. at ——, 112 S.Ct. at 995 (emphasis added) (citation omitted).[2]

Our conclusion as to the requisite state of mind in this case is consonant with cases from other circuits. In *Jasper v. Thalacker,* 999 F.2d 353 (8th Cir.1993), for example, the court applied the "maliciously and sadistically" standard to the use of a "stun gun" to subdue an unruly and assaultive prisoner in the solitary confinement unit of an Iowa pris-

---

**2.** The dissent claims we erroneously expand the riot standard beyond its intended reach. We respectfully believe the dissent overlooks the Court's language in *Hudson.*

on. A similar approach can be found in *Caldwell v. Moore,* 968 F.2d 595 (6th Cir. 1992) wherein a stun gun was used to quiet a disruptive and unruly inmate in an isolation cell. In *Romano v. Howarth,* 998 F.2d 101 (2d Cir.1993), the "maliciously and sadistically" standard was held to apply to the force used by guards to subdue and control a problem inmate who was resisting a nurse's attempt to administer a sedative. In *Williams v. Burton,* 943 F.2d 1572 (11th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3002, 120 L.Ed.2d 877 (1992), the Eleventh Circuit was confronted with an inmate housed in a segregation unit in a prison in Alabama whose behavior resembled Le-Maire's. In response to an incident wherein Williams cursed at officers, threatened them with death, spit on them, and created a general disturbance in the segregation unit, he was placed in four-point mechanical restraints in his cell and his mouth was taped until he agreed to be cooperative. Williams sued, claiming such a use of restraints violated his Eighth Amendment rights. Citing *Whitley,* the court elected the highest standard of culpability as controlling. The court observed:

> [W]here the conduct in question occurs in restoring official control during a prison disturbance, any security measure undertaken to resolve the disturbance gives rise to an Eighth Amendment claim *only* if the measure taken "inflicted unnecessary and wanton pain and suffering" caused by force used "maliciously and sadistically for the very purpose of causing harm."

*Id.* at 1575 (quoting *Whitley,* 475 U.S. at 320–21, 106 S.Ct. at 1084–85). *See also Stenzel v. Ellis,* 916 F.2d 423 (8th Cir.1990) (applying the *Whitley* standard to measures designed to remedy the behavior of a prisoner refusing to abide by prison rules related to security); *Brown v. Smith,* 813 F.2d 1187 (11th Cir. 1987) (applying the "malicious and sadistic" standard to force used to make a recalcitrant prisoner return to his cell).

## IV

Having identified the principles that control our analysis, we now turn to each of LeMaire's complaints. In so doing, we examine the need for the application of the measure or sanction complained of, the relationship between the need and the measure or sanction used, the extent of any injury inflicted, and the extent of the surrounding threat to the safety of staff and inmates. These factors help determine whether the handling of LeMaire was for the purpose of maintaining or restoring discipline, or for the malicious and sadistic purpose of causing him harm. We also agree with the approach taken by the Seventh Circuit in *Bruscino v. Carlson,* 854 F.2d 162 (7th Cir.1988), *cert. denied,* 491 U.S. 907, 109 S.Ct. 3193, 105 L.Ed.2d 701 (1989), concerning the maximum security federal penitentiary known as Marion: "There is no question that conditions [in prison] deserve careful scrutiny, but they must be evaluated against the background of an extraordinary history of inmate violence and with proper regard for the limited competence of federal judges to micromanage prisons." *Id.* at 164–65.

### A.

### Strip Status

■ The DSU regulations permit the removal of an inmate's personal property in limited situations. Those regulations read in pertinent part:

> A disciplinary-segregated inmate may be required to forfeit or be temporarily deprived of any service or activity when the inmate is using them to destroy or damage property, obstruct security, or threatens physical violence to himself/herself or others.... Any item(s) withheld are to be returned at the earliest possible time when the basis for removal has ceased to exist.

Or.Admin.R. 291–11–064(1). The district court made a finding that this regulation had been relied on to place DSU inmates in "strip status," in which they were deprived of clothing, bedding, and personal possessions until they earned these items back piece-by-piece with good behavior. The district court observed that

> [p]laintiff and other inmates' testimony that they have been stripped in their cells and left there for extended periods without clothing, bedding, or the most basic of

property, such as toilet paper, was uncontroverted and unimpeached. I accept this testimony and plaintiff's testimony that he is unable to keep warm while unclothed in his cell. During my tour of the DSU, I was not only fully clothed and moving, but wearing a coat. I noted that the DSU was cold and damp.

The district court also found that some of these deprivations extended for up to three days.

In analyzing this claim, the district court determined that "inmates misuse clothing, bedding and other property to assault others, injure themselves, and damage property." Thus, the court found a specific security need or penological justification for removing such items "for so long as a misuse of clothing and property presents a serious risk to personal safety or of property damage."

In its injunction, however, the district court not only ordered that appellant only remove clothing or personal property when it poses a serious risk to personal safety or property damage, but also required the prior approval of a psychiatrist if the removal was to be for a period of more than two hours. The court also mandated that when a psychiatrist authorizes removal of such property, the psychiatrist must "personally observe the inmate not less than once every four hours."

The state complains that under these circumstances, the scope of the injunction was excessive. Citing *Spain v. Procunier*, 600 F.2d 189 (9th Cir.1979), and *Hoptowit v. Ray*, 682 F.2d 1237 (9th Cir.1982), the state argues that the appropriate remedy is to enjoin the state to follow its own rule. We agree. First, the Constitution does not mandate psychiatric approval in connection with the removal of property for inmates when a security risk exists. Second, the record contains nothing to indicate the appellant has not followed court orders in the past. *See Hoptowit*, 682 F.2d at 1247 ("[T]he remedy may be only so much as is required to correct the specific violation. A remedy may go beyond this only when there is a record of past constitutional violations and violations of past court orders.")

We have examined the state's rules and procedures in this respect and conclude that they satisfy the demands of the Constitution. Accordingly, we vacate this part of the district court's injunction and remand with instruction to the court to rewrite it to require only that the state abide by its own rules governing this aspect of its disciplinary procedures.

### B.

### Nutraloaf

■ LeMaire first contends his placement in a "controlled feeding status," in which his diet is restricted to a substance called "Nutraloaf," violates the Eighth Amendment. Nutraloaf as used in this case is a temporary substitute for a regular prison diet. It is made by blending a variety of foods from normal prison meals. Only fresh ingredients are used, and they are mixed according to nutritionally balanced recipes. The resulting substance is then frozen and later baked into a solid loaf and fed to inmates. This loaf, while not particularly appetizing, does exceed an inmate's minimal daily requirements for calories, protein, and vitamins. Under prison regulations, an inmate may be placed on a Nutraloaf diet when he throws or misuses food or human waste, or fails to return trays or eating utensils. Or.Admin.R. 291–83–010(1). Nutraloaf is designed to be eaten without utensils. This deprives inmates of implements they frequently use to throw feces. It is doubtful, however, that its use has any effect on the production of human waste, because it is essentially composed of regular prison food. Under prison regulations, Nutraloaf "shall be rescinded when the inmate demonstrates a return to acceptable behavior for a period of 24 hours," Or.Admin.R. 291–83–015(7), and under no circumstances should an inmate remain in this status for more than seven days. Or.Admin.R. 291–83–015(8).

The district court determined that Nutraloaf was being used punitively to control inmate behavior, and found that inmates were frequently placed in controlled feeding status for non-food or utensil related behavior. The record seems to support this determination. While not declaring the use of Nutraloaf unconstitutional *per se*, the court

did conclude that certain of DSU's punitive uses of Nutraloaf violated the Eighth Amendment: (1) the placement of inmates on Nutraloaf for conduct unrelated to the misuse of food or utensils; and (2) extending Nutraloaf use well beyond the cessation of the offending inmate behavior.

■ We need not grapple here with the application of *Wilson's* subjective test, because LeMaire's complaint regarding the use of Nutraloaf does not rise to the threshold level of a deprivation that satisfies *Wilson's* objective component. The Eighth Amendment requires only that prisoners receive food that is adequate to maintain health; it need not be tasty or aesthetically pleasing. *Cunningham v. Jones,* 567 F.2d 653, 659–60 (6th Cir.1977). "The fact that the food occasionally contains foreign objects or sometimes is served cold, while unpleasant, does not amount to a constitutional deprivation." *Hamm v. DeKalb County,* 774 F.2d 1567, 1575 (11th Cir.1985), *cert. denied,* 475 U.S. 1096, 106 S.Ct. 1492, 89 L.Ed.2d 894 (1986). In *Hutto v. Finney,* 437 U.S. 678, 686–87, 98 S.Ct. 2565, 2571–72, 57 L.Ed.2d 522 (1978), the Supreme Court observed that serving inmates a tasteless food concoction called "grue", which provided only 1000 calories a day, might be unconstitutional if served for long periods.[3] Nutraloaf and grue, however, are not comparable. As noted, Nutraloaf provides an excess of nutritional requirements and LeMaire, unlike the *Hutto* inmates who lost weight, has actually gained some sixty pounds in confinement. LeMaire is not being starved. He is being fed, and he is being fed adequately.

The use of Nutraloaf in the DSU is not "incompatible with 'the evolving standards of decency that mark the progress of a maturing society.'" *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 289, 50 L.Ed.2d 251 (1976) (quoting *Trop v. Dulles,* 356 U.S. at 101, 78 S.Ct. at 598). To quote the Supreme Court, "extreme deprivations are required to make out a conditions-of-confinement claim. Because routine discomfort is 'part of the penalty that criminal offenders pay for their

offenses against society,' 'only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation.'" *Hudson v. McMillian,* —— U.S. at ——, 112 S.Ct. at 1000 (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981), and *Wilson,* —— U.S. at ——, 111 S.Ct. at 2324) (internal quotations and citations omitted). Because a temporary Nutraloaf diet does not deny "the minimal civilized measure of life's necessities," its use falls short of the threshold deprivation necessary to form the basis of an Eighth Amendment violation.

Even if serving Nutraloaf to an inmate did satisfy the objective prong of the test, LeMaire has failed to show DSU officials had a sufficiently culpable state of mind to meet the subjective test. There is not a scintilla of evidence in this record to indicate that the officials imposing Nutraloaf were either deliberately indifferent to LeMaire's health or welfare, or that as a sanction they were imposing Nutraloaf "maliciously or sadistically for the very purpose of causing harm." Lacking any proof or indication of the presence of the element of the necessary subjective component of the test, we conclude that the district court's holding in this regard is unsupported as a matter of law.

Nutraloaf provides an adequate prison diet and under the relevant prison regulations its use is limited to food-related infractions and cannot be imposed for more than seven days. Serving an inmate Nutraloaf as authorized under prison regulations and for such short periods does not deprive an inmate of "basic human necessities" and thus its use does not violate the Eighth Amendment. Because we determine the prison regulations regarding the use of Nutraloaf withstand constitutional scrutiny, the district court's injunction regarding Nutraloaf should do no more than require prison officials follow those regulations. We so hold, and remand so the injunction may be reworded accordingly.

---

3. The Supreme Court did note that "a diet of 'grue' *might be tolerable for a few days* and intolerably cruel for weeks or months." *Hutto,* 437 U.S. at 686–87, 98 S.Ct. at 2571–72 (emphasis added).

## C.

### In–Shower Restraints

■ LeMaire and other dangerous DSU residents are placed in restraints when taken out of their cells. The purpose of this practice is to protect staff and inmates. These restraints, which include handcuffs and shackles, remain in place while inmates shower. LeMaire asserts the use of such in-shower restraints violates the Eighth Amendment.

There is no evidence in the record Le-Maire has suffered any serious injury as a result of this practice which is cognizable under the objective component of Eighth Amendment claims. Although an injunction certainly can be issued to protect inmates from unsafe conditions before serious injury has occurred, *Helling v. McKinney*, — U.S. ——, ——, 113 S.Ct. 2475, 2481, 125 L.Ed.2d 22 (1993), we do not find that shackling a dangerous inmate in a shower creates a sufficiently unsafe condition. Even if the floors of the shower are slippery and LeMaire might fall while showering, "slippery prison floors ... do not state even an arguable claim for cruel and unusual punishment." *Jackson v. Arizona*, 885 F.2d 639, 641 (9th Cir.1989). We believe *not* restraining a dangerous inmate like LeMaire when he is loose in the shower room creates a situation which is potentially far more dangerous than forcing him to shower while shackled. Furthermore, the record is devoid of any evidence whatsoever from which it could be even vaguely inferred that in shackling LeMaire during his showers, prison officials either were deliberately indifferent to his medical or personal needs, or acted with malice or intent to cause harm. The purpose of the restraints is not to injure LeMaire or make it difficult for him to shower, but again, to protect staff. We see this practice as a security imperative. The shower area in the DSU was not secure and did not have a door when this action was filed. Although we have been informed that a door has now been installed, that does not end our consideration of this matter. Common sense and the record tell us it is foolish and inattentive to the safety of staff not to restrain LeMaire when he is outside his cell. Thus, even a door

securing the shower area would not abate this threat if LeMaire refuses to cooperate once free inside. LeMaire's documented assaults on January 5, 1987, February 1, 1989, August 14, 1989, and February 19, 1990, *see* Part I, demonstrate beyond all doubt the wisdom of restraining this inmate.

Thus, LeMaire's Eighth Amendment claim as to this practice is manifestly without merit. In view of the damage LeMaire has inflicted on staff and inmates alike, his countervailing concern that he might fall down and hurt himself while taking a shower strikes us as absurd. Certainly we do not wish harm to LeMaire, but it is he who puts himself at risk, not the prison administrators. That LeMaire finds showering in restraints difficult is merely the price he must pay for his violent in-prison behavior. As the Seventh Circuit observed in *Bruscino,* "The handcuffing, the shackling, ... the spread-eagling, and the rectal searches are reasonable measures in view of the history of violence at the prison and the incorrigible, undeterrable character of the inmates." *Bruscino,* 854 F.2d at 166.

## D.

### Exercise Privileges

LeMaire objects to the disciplinary removal of his out-of-cell exercise privileges and claims this deprivation violates the Constitution. The district court determined that for disciplinary and safety reasons LeMaire had been deprived of outside exercise for most of a five-year period of incarceration. The court found that this practice violates the Eighth Amendment.

■ At the outset, we agree that ordinarily the lack of outside exercise for extended periods is a sufficiently serious deprivation and thus meets the requisite harm necessary to satisfy *Wilson's* objective test. Exercise has been determined to be one of the basic human necessities protected by the Eighth Amendment. As the *Wilson* Court stated, to satisfy the objective test, the Eighth Amendment violation must include "the deprivation of a single, identifiable human need such as food, warmth, or *exercise.*" *Wilson,* — U.S.

at ——, 111 S.Ct. at 2327 (emphasis added). In addition, this circuit has determined the long-term denial of *outside* exercise is unconstitutional. In *Spain v. Procunier*, 600 F.2d 189 (9th Cir.1979), the court declared unconstitutional the deprivation of outdoor exercise for inmates held longer than four years. *Id.* at 200. LeMaire has been denied such exercise privileges for considerable periods of time and thus has suffered a sufficiently serious deprivation under the Eighth Amendment.

▮ The question presented in this case is whether curtailing these outdoor exercise privileges as to LeMaire, because he both abused them and represents a grave security risk when outside his cell, meets the subjective requirements for an Eighth Amendment violation. We think not. LeMaire's loss of outside exercise privileges is directly linked to his own misconduct, which raises serious and legitimate security concerns within the prison. We note in particular LeMaire's armed attack on two correctional officers as he exited the outside exercise cubicle on August 14, 1989, *which he vowed to repeat.* The physical threat he poses to staff and other inmates is well documented and has already been discussed at length in this opinion.

Thus LeMaire's claim does not survive scrutiny under the subjective analysis mandated by *Wilson.* The decision by prison officials to curtail LeMaire's outside exercise privileges does not reflect "deliberate indifference," nor was the restriction imposed "maliciously or sadistically for the very purpose of causing harm." Unlike the situation in *Spain,* the DSU does not have a broad policy which prohibits outside exercise for all inmates. DSU inmates free of infractions for forty-five days have abundant exercise privileges available to them in the DSU. This includes exercise privileges outside of their cells and out-of-doors five days a week. All LeMaire had to do was to follow the rules. In each instance resulting in the curtailment of his exercise privileges, LeMaire was afforded an appropriate hearing before the sanction was imposed. At no time was the imposition of this sanction arbitrary or capricious.

We also note that LeMaire has not been deprived of all opportunities to exercise. He still can exercise within his cell. Although inmates had previously been issued only shower thongs, which made exercising on the concrete floors of their cells difficult and dangerous, the district court's injunction required that all inmates be issued tennis shoes for exercise. The state does not dispute that requirement. With the appropriate footwear, LeMaire's own expert witness, an orthopedic specialist, testified before the district court that low and non-impact aerobic exercise can be done in the DSU cells, which are eight feet high, six feet wide, and eight feet, four inches deep. LeMaire and similarly situated inmates thus are not being deprived of *all* exercise.

We reiterate what appears to be the central theme of this opinion: LeMaire is the master of his own fate. As long as he engages in violent and disruptive behavior, prison officials are authorized and indeed required to take appropriate measures to maintain prison order and discipline and protect staff and other prisoners from such violent inmates. As soon as LeMaire's actions indicate he is no longer a serious security threat, his exercise privileges will be restored. We conclude that the district court's determination that the restriction on LeMaire's exercise privileges shows deliberate indifference to his well-being is not supported by the record. Accordingly, his Eighth Amendment claim fails as to this issue.

### E.

#### Quiet Cells

The DSU contains six constantly illuminated "quiet cells," which are used for separating "noisy, disruptive" inmates from the rest of the DSU population. To accomplish this purpose, these cells have two solid outer doors which separate them from the prison tier and DSU staff office. The district court determined that these doors made it impossible for the inmates housed in these cells to summon guards to assist them. The court decided that use of such cells violates the Eighth Amendment because "[p]rison officials show deliberate indifference to serious

medical needs if prisoners · are unable to make their medical problems known to the medical staff." *Hoptowit v. Ray,* 682 F.2d 1237, 1253 (9th Cir.1982). The court also found that terminally ill inmates had been placed in "quiet cells" for extended periods.

Appellant does not dispute these determinations and thus we need not grapple with the appropriate Eighth Amendment standard. As the state freely admits in its brief, "[T]he state does not dispute that denial of reasonable access for medical services violates the Eighth Amendment." Instead, the state challenges two aspects of the district court's injunction to remedy this violation: (1) the injunction applies to *all* inmates housed in such cells, but should apply only to those "similarly situated" to LeMaire, i.e., those with serious health problems; and (2) the court's ordering of both an intercom and an open cell door redundantly serve the same purpose of ensuring that an inmate can summon a guard in an emergency.

We reject appellant's first argument. Although inmates with preexisting medical problems are more likely to require medical assistance, previously healthy inmates nonetheless may have a medical emergency or be injured in a fall or accident. Appellant's second argument has more merit. The district court ordered that the solid outer door of the "quiet cell" remain open at all times and that an intercom system, which appellant has apparently already installed, be maintained between the cell and the guard station. Either of these requirements will allow an inmate to summon help if necessary and thus would be sufficient to remedy the violation, but *both* are not constitutionally mandated. "The function of a court is limited to determining whether a constitutional violation has occurred and to fashioning a remedy that does no more and no less than correct that particular constitutional violation." *Hoptowit,* 682 F.2d at 1246 (citations omitted). LeMaire argues that there is no redundancy and envisions a scenario where an extremely ill inmate would be unable to reach an intercom switch to summon help.

Indeed, the scope of this aspect of the controversy has diminished almost to the point of nonexistence. Appellant accedes to the idea that a viable intercom system sufficient to allow inmates in the quiet cells to communicate with the guards is acceptable, or in the alternative, the doors will not be closed. The state also agrees to modify its use of lighting in the cells. Taking the state at its word, we dissolve the district court's injunction as to the management of quiet cells and remand to the district court for the entry of an order, by consent or otherwise, that will provide inmates in quiet cells with a communications system or other provisions adequate to address their legitimate medical needs.

### F.

#### In–Cell Restraints

The prison regulations allow when necessary the use of two types of restraints: full mechanical restraints and full in-cell restraints. Full mechanical restraints or "strap down" restraints involve the virtual immobilization of a prisoner using four point or "spread eagle" restraints. Full in-cell restraints are far less restrictive and involve the use of only handcuffs or handcuffs and waist chains. The district court determined the use of in-cell restraints violated the Eighth Amendment. The precise factual determinations made by the district court are unclear and it is difficult to ascertain whether the court determined that full mechanical restraints or only full restraints were being utilized. The district judge stated there was "uncontroverted evidence plaintiff has been held in his cell for days at a time, in full mechanical restraints." However, the judge then immediately cites the applicable prison regulation as Or.Admin.R. 291–13–035(2)(c), which deals with the lesser full, not full mechanical, restraints. The judge then repeatedly refers to the restraints as "full restraints." The court also stated the inmates in restraints had "difficulty" eating, sleeping and performing basic tasks. Because performance of those tasks would be more than merely "difficult" but would be impossible in full mechanical restraints, the court apparently found evidence of only full restraint usage. However, this issue is not critical, as we determine the use of either form of in-cell

restraints, when imposed in strict compliance with existing prison regulations, does not violate the Eighth Amendment.

The court found that LeMaire and other inmates had been placed in full in-cell restraints for "days at a time." Two inmates were deprived of all clothing and placed in leg irons and belly chains "for several days at a time." The court found other instances where two inmates were placed in restraints for seven and five days respectively. The court further noted that "[d]efendant presented no evidence of a control procedure to ensure that this practice is used only for safety purposes and limited to the time necessary to serve that purpose." The court determined that "individual guards decide whether and how long in-cell restraints will be kept on, with no meaningful monitoring or supervision." These factual determinations, based upon first-hand uncontroverted testimony, are not clearly erroneous.

Accepting the district court's findings concerning the use of full restraints as correct, it appears to us the prison is violating its own regulations. The regulations governing the use of full restraints provides in part that full restraints

> may only be used ... with the express approval of the superintendent or designee and then only upon a demonstration that the inmate is out of control and engaged in behavior which ... could (A) Result in major destruction of property; (B) Constitute a serious health or injury hazard to the inmate or others; (C) Escalate into a serious disturbance.... The inmate will be released as soon as it is reasonable to believe the behavior leading to the use of the restraints will not immediately resume.

Or.Admin.R. 291–13–035(2). The state has informed us they will not defend any prison practices beyond what is authorized in the prison regulations. Instead, the state is challenging "the district court's opinion and injunction only to the extent they limit defendant's ability to enforce his rules."

Assuming the imposition of full in-cell restraints, which as the district court found, make it difficult for an inmate to sleep, eat, drink water, or stay warm, state a sufficient objective deprivation under the Eighth Amendment, their use under existing regulations to maintain security and safety do not reflect "deliberate indifference" or malice and sadism. We agree with the Seventh Circuit, which has upheld the use of the more restrictive full mechanical in-cell restraints, even for extended periods of time. *Bruscino v. Carlson*, 854 F.2d 162 (7th Cir.1988), *cert. denied*, 491 U.S. 907, 109 S.Ct. 3193, 105 L.Ed.2d 701 (1989). In an examination of the federal penitentiary at Marion, Illinois, the court found that "[i]nmates who throw food or otherwise misbehave in their cells are sometimes tied spread-eagled on their beds, often for hours at a stretch." *Id.* at 164. The *Bruscino* court found this practice to be within constitutional limits as one of the few ways order could be maintained, and felt such drastic measures were justified, given the "history of violence at the prison and the incorrigible, undeterrable character of the inmates." *Id.* at 165–66. As we have observed, the inmates incarcerated in the DSU have proven themselves to be equally as dangerous. The use of in-cell restraints to control their behavior and maintain security does not violate the Eighth Amendment. The Eleventh Circuit reached a similar conclusion in *Williams v. Burton*, 943 F.2d 1572 (11th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 3002, 120 L.Ed.2d 877 (1992), in which the court held that placing a disruptive inmate in four-point restraints with adhesive tape covering his mouth was "both prudent and proper" and did not violate the Constitution. *Id.* at 1575.

We conclude the current prison regulations governing the use of in-cell restraints are constitutionally acceptable. We agree with the district court's finding that the prison was not following these regulations. However, we do not agree with the court's injunction, which went beyond what was necessary to remedy this situation. We therefore vacate this aspect of the district court's injunction, and remand for an order concerning in-cell restraints which requires no more than the prison's strict adherence to the regulations they have already established.

## V

Attorneys' fees in a case such as this may be awarded in the discretion of the court to a

"prevailing party." The Civil Rights Attorney's Fees Awards Act of 1976 provides in relevant part that:

> [i]n any action or proceeding to enforce [specified] provision[s] of [the federal civil rights laws, including 42 U.S.C. § 1983], the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

42 U.S.C. § 1988. The Supreme Court has rejected the notion that, to be considered a prevailing party, the plaintiff must obtain the "primary relief sought". *Texas State Teachers Ass'n v. Garland Independent School Dist.*, 489 U.S. 782, 791, 109 S.Ct. 1486, 1492, 103 L.Ed.2d 866 (1989). Instead "plaintiffs may be considered prevailing parties 'if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing the suit.'" *Rock Creek Ltd. Partnership v. State Water Resources Control Bd.*, 972 F.2d 274, 279 (9th Cir.1992) (quoting *Texas Teachers*, 489 U.S. at 789, 109 S.Ct. at 1492), *cert. denied,* ── U.S. ──, 113 S.Ct. 2439, 124 L.Ed.2d 657 (1993). However, a party cannot be considered to have prevailed if "the plaintiff's success on a legal claim can be characterized as purely technical or *de minimis.*" *Texas Teachers*, 489 U.S. at 792, 109 S.Ct. at 1493. "[A]t a minimum, to be considered a prevailing party within the meaning of § 1988, the plaintiff must be able to point to a resolution of the dispute which changes the legal relationship between itself and the defendant." *Id.* If so, the plaintiff has "crossed the threshold to a fee award of some kind." *Id.*

■ In the instant case, LeMaire has failed on most of his claims. However, his success on a few of his claims altered the legal relationship of the parties and LeMaire can therefore be deemed a "prevailing party" under § 1988. While the limited nature of this success does not deprive LeMaire of his prevailing status, it does affect the reasonable amount of fees his attorneys may receive. "Where such a change [in the legal relationship of the parties] has occurred, the *degree of the plaintiff's overall success goes to the reasonableness of the award* ..., not to the availability of a fee award *vel non.*" *Id.* at 793 (emphasis added).

■ Because LeMaire prevailed on only a few issues, his reasonable attorneys' fees must be reduced to reflect the limited degree of his success. The district court must determine the extent to which the plaintiff prevailed and adjust the requested fee accordingly. *Hensley v. Eckerhart,* 461 U.S. 424, 433–38, 103 S.Ct. 1933, 1939–42, 76 L.Ed.2d 40 (1983). There is no precise formula for determining the extent to which a party has prevailed. The district court "has discretion in determining the amount of a fee award . . . . [because] of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." *Id.* at 437, 103 S.Ct. at 1941. Accordingly, the district court's award of attorneys' fees is vacated in its entirety, and the matter is remanded for reconsideration in light of this opinion and *Texas Teachers.*[4]

## VI

The record contains no evidence LeMaire suffered any significant injury from any of the practices he specifies. Moreover, the record establishes conclusively that *none* of the named practices were unnecessary, or imposed on him maliciously or sadistically or for the purpose of causing harm, nor is there any evidence in this record that the Superintendent or his employees were deliberately indifferent to LeMaire's medical needs. The practices he complains of and the sanctions he received for his misconduct were all meted out either in exigent circumstances or with appropriate due process and ample opportunity for LeMaire to be heard. The

4. Because we are vacating the amount of reasonable attorneys' fees awarded by the district court, we do not address the issue of whether the court abused its discretion in increasing the award with a 1.33 multiplier. On remand, however, we would encourage the court to incorporate the Supreme Court's recent decision in *City of Burlington v. Dague,* ── U.S. ──, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992), which held that enhancement of fees to reflect the fact the plaintiff's attorneys were retained on a contingent-fee basis is not permitted. *Id.* at ──, 112 S.Ct. at 2643–44.

sanctions were temporary, and their removal was entirely a matter of LeMaire following prison rules designed to maintain order and promote security. As noted, he was under none of the restrictions he complains of between April 11, 1989 and August 14, 1989, presumably because he obeyed the rules. None of these sanctions per se is barbaric, inhumane, or involves torture, nor do they treat prisoners as "less than human beings." *Spain v. Procunier,* 600 F.2d 189, 200 (9th Cir.1979) (citing *Furman v. Georgia,* 408 U.S. 238, 271–73 (1972) (Brennan, J., concurring)). No "rack" or "screw" or their equivalents are present in this case. *See Wilkerson v. Utah,* 99 U.S. 130, 136, 25 L.Ed. 345 (1878) ("[P]unishments of torture ... and all others in the same line of unnecessary cruelty, are forbidden by [the Eighth Amendment]").

Thus, no actionable state of mind as to those imposing the sanctions can be inferred just from the fact that the practices and sanctions at issue have been used. Just as the death penalty itself is not cruel and unusual punishment for some murderers, neither are the sanctions imposed against LeMaire cruel and unusual with respect to his behavior and his rules violations. It is not possible to view each sanction as anything other than an appropriate response to his behavior.

■ If the measures of which LeMaire complains violate the Eighth Amendment and cannot be used to control the behavior of prisoners in the DSU such as LeMaire, we cannot help but wonder what alternatives remain. What other methods can prison officials utilize to control inmates like him? He is oblivious to the considerations that keep normal people in line, such as reputation and peer approval. Either in or out of prison, the law has no effect on his conduct. Rules to him are irrelevant. Human life means very little. Prosecution or the threat thereof does not deter him in the slightest, and why should it? He is serving a life sentence, and he certainly has not been building a record that would ever cause him to be released.

Punishment by incarceration or by segregation in the DSU has made no dent in his explosive behavior. When one stops to contemplate where LeMaire is and why he is there, it becomes clear that prison officials do not have many options to protect themselves and maintain prison security *except* the kinds of responses that are the subject of this case. To deprive prison officials of the sanctions they have used against LeMaire would virtually hamstring them and leave them defenseless against him. This we decline to do. "To allow prisoners to choose which jailhouse rules they will obey would result in chaos." *Stenzel v. Ellis,* 916 F.2d at 428. Moreover, prison administrators have an obligation imposed by the Constitution to protect inmates from each other. *See, e.g., Redman v. County of San Diego,* 942 F.2d 1435 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 972, 117 L.Ed.2d 137 (1992).

Because we have told prison administrators they cannot use sticks to punish behavior, it would be bizarre also to rule out reasonable carrots. We note in this regard that LeMaire does have the ability to respond positively and constructively to these sanctions rather than making things worse. During oral argument, we were advised that LeMaire had been returned to the general population where he remained violation free for some time. Then he was transferred to a prison in Nevada, under the Oregon Department of Corrections Interstate Corrections Compact, to continue serving his sentence.[5] Counsel for LeMaire candidly admits he advised his client to stay out of trouble pending this lawsuit. Apparently, LeMaire has followed this sound advice. We sincerely hope he has learned his lesson. He and no one else holds the key to his future. If he resumes his old ways, no doubt he may return yet again to the DSU.

We are most impressed by the extensive prison records in this case documenting LeMaire's misconduct, the hearings he was accorded, and the written recommendations of

---

5. LeMaire's current status, however, does not moot this controversy. Because he remains under the control of the Oregon prison system, the practices and sanctions of which he complains are certainly capable of repetition. *Sample v.*

*Johnson,* 771 F.2d 1335, 1339–43 (9th Cir.1985), *cert. denied,* 475 U.S. 1019, 106 S.Ct. 1206, 89 L.Ed.2d 319 (1986). Moreover, the district court's injunction as to the management of disruptive inmates in the DSU is ongoing.

the hearings officers. We also are impressed by the remarkable lack of any claim by Le-Maire that he was beaten or roughed up by prison officials, including those whom he repeatedly attacked with his weapons, his body, his urine, and his feces. In this respect, this case stands in clear contrast to *Hudson v. McMillian,* wherein guards ventilated their frustration with a fractious inmate by punching him in the head and kicking him about the body. *Hudson,* —— U.S. at ——, 112 S.Ct. at 997. *See also Corselli v. Coughlin,* 842 F.2d 23 (2nd Cir.1988) (inmate allegedly punched and knocked unconscious). Under the circumstances, we commend the OSP officials for their general adherence to their rules and procedures, and for their professional restraint.

As Judge Posner observed in *Bruscino,* "The current conditions, ghastly as they are, testify in a weird way to our nation's aspirations to a humane criminal justice system, for they result from forbidding murderous inmates to be executed or to be killed or beat senseless by outraged guards...." *Bruscino,* 854 F.2d at 166. To deprive prison officials of the measures used in this case to control prisoners ironically might encourage the very behavior the Eighth Amendment was designed to prevent.

The district court's injunction is VACATED and this case is REMANDED for the issuance of an order consistent with this opinion.

NOONAN, Circuit Judge, dissenting:

As a preliminary and decisive question, this court should have decided whether the appeal was moot. On May 11, 1993 the court was notified by counsel for LeMaire that LeMaire had been transferred to a prison in Nevada. On June 14, 1993 the Superintendent responded to this suggestion by agreeing that on May 1, 1993 LeMaire had been transferred to a Nevada prison. The Superintendent went on to substantially agree that the case was moot. He observed, first, that the case has not been certified as a class action. Second, he noted that it would be inappropriate to remand for such certification since "the physical facilities and the regulatory means for controlling the disrup-tive inmates have changed." Third, he noted that whether the conduct complained of would recur turned on whether it was reasonably likely that LeMaire would "once again be placed in disciplinary segregation in Oregon and again be subjected to the practices that he challenged." It did not seem to the Superintendent reasonably likely that he would be returned; in his opinion "that possibility is at best uncertain." Moreover, since there were new rules and a new segregation facility it was apparent that it was difficult to say that the same measures would be taken if he were returned to Oregon.

We, of course, have no jurisdiction to render advisory opinions. This limitation on our jurisdiction is fundamental. It is not to be evaded for the sake of educating the prison authorities of Oregon. *Preiser v. Newkirk,* 422 U.S. 395, 401, 95 S.Ct. 2330, 2334, 45 L.Ed.2d 272 (1975). Consequently, we should follow our normal procedure and vacate both the decision and the judgment below. *United States v. Munsingwear,* 340 U.S. 36, 39–40, 71 S.Ct. 104, 106–107, 95 L.Ed. 36 (1950).

As the court has proceeded to judge the merits, I add the following:

**First.** We have no business resolving the issues on this case on this appeal. The majority opinion notes forthrightly that the governing standard was established by the Supreme Court at a time after the district court had made its decision. Consequently, the district court has never been given the opportunity to apply the standard. The opportunity should be given. *LaDuke v. Nelson,* 796 F.2d 309, 310 (9th Cir.1986).

The concession of LeMaire's counsel that we could decide without remand cannot alter the fundamental error in an appellate court resolving serious factual issues as to which the district court has made no findings. *Pullman–Standard v. Swint,* 456 U.S. 273, 291–292, 102 S.Ct. 1781, 1791–1792, 72 L.Ed.2d 66 (1982). The majority opinion states in so many words: "The district court's opinion contains no specific findings of fact or conclusions whatsoever as to the requisite state of mind of the officials accused by LeMaire." The obvious inference from this statement is that we should remand for

specific findings of fact. We err in deciding without the benefit of the district court's examination of the evidence in the light of the recent decisions of the Supreme Court.

Our imprudence is made worse in the particular instance of "in-cell restraints," as to which the majority opinion admits that it is not clear as to whether the district court was referring to "full mechanical restraints" or a lesser form of in-cell restraint. To me it is startling that it makes no difference to the court whether the restraints used are mechanical, "strap down," restraints involving the virtual immobilization of the prisoner or whether the restraints are somewhat less total. The desire to decide the issue, whatever the type of restraint, seems to me to lead to an abandonment of judicial restraint in favor of an impulse to give approbation to the full range of discipline in the prison.

**Second.** Occasions exist as to which *Wilson v. Seiter*, — U.S. —, —, 111 S.Ct. 2321, 2326, 115 L.Ed.2d 271 (1991) requires for relief that the prison officials act "maliciously and sadistically for the very purpose of causing harm." Then we are not to critique in hindsight the exercise of judgment of a particular officer on a specific occasion. *Jordan v. Gardner*, 986 F.2d 1521, 1528 (9th Cir.1993) (en banc). Deliberate indifference remains the appropriate standard with regard to allegations of inhumane conditions of confinement or inadequate medical care. *See Wilson*, — U.S. at —, 111 S.Ct. at 2326. The majority opinion erroneously expands the standard intended to be applied in the case of a prison riot or an immediate face-to-face confrontation of a prisoner with a prison official and finds this standard to be the one governing the application of measures deliberately taken by prison officials when no emergency exists.

Here we are not considering ad hoc response to an emergency, but a penological policy of punishing harshly the disruptive conduct of a prisoner. The kind of measures used—serving unpalatable food, denying outside exercise, using shackles in the shower and full restraints in the cell, keeping the person naked in the cell, isolating the prisoner in a special sound-proofed and constantly lighted cell—are measures correctly described as conditions of prison life for this prisoner and for other prisoners similarly situated. Each of these measures involves the infliction of pain under the standard set by *Jordan v. Gardner, supra* at 1526. Each of the measures may, depending on the finding of the district court, involve deliberate indifference on the part of the prison officials and so constitute cruel and unusual punishment. *Id.* at 1528.

**Third.** The majority opinion makes a dramatic showing that LeMaire has on occasion acted like a beast. As the district court judge aptly remarked: "Prisoners who complain about the condition of their confinement do not generally get much sympathy from society, but sympathy is not the issue here. From society's long-term perspective, there are sound reasons for prohibiting cruel and unusual punishment." The Eighth Amendment, prohibiting such punishment, draws its life from the religious and humane traditions of our country. The message of the majority opinion appears to be that a beast deserves beastly treatment. A wiser spirit, more in conformity with Eighth Amendment traditions, informed the opinion and decision of the district judge. He should be given the opportunity to reconsider the case in the light of the new standard set by the Supreme Court.