**James D. STENZEL, Appellant,**

v.

**Jim ELLIS, Jailer, Pat Adams and Lynn F. Jacobs, all sued in their official and individual capacities, Appellees.**

No. 89–5309.

United States Court of Appeals, Eighth Circuit.

Submitted May 18, 1990.

Decided Oct. 8, 1990.

---

Robert A. Christenson, Sioux Falls, S.D., for appellant.

Susan J. Brunick, Sioux Falls, S.D., for appellees.

Before LAY, Chief Judge, BOWMAN and WOLLMAN, Circuit Judges.

BOWMAN, Circuit Judge.

James D. Stenzel brought this lawsuit under 42 U.S.C. § 1983 (1982) seeking damages for alleged Eighth and Fourth Amendment violations as a result of treatment he received at the hands of defendants Jim Ellis, Pat Adams, and Lynn Jacobs, jailers at the Minnehaha County Jail in Sioux Falls, South Dakota. The District Court[1] granted defendants' motion for summary judgment and entered a final judgment in their favor. Stenzel appeals. We affirm.

When reviewing the grant of defendants' motion for summary judgment, we are required to view the evidence in the light most favorable to plaintiff Stenzel, giving him the benefit of all reasonable inferences. We will affirm only if we find no genuine issues of material fact, and can decide the case on legal grounds alone. *White v. Farrier*, 849 F.2d 322, 325 (8th Cir.1988). Cognizant of that standard, we recite the following facts that either are uncontested or comport with Stenzel's version of the incidents that precipitated this

1. The Honorable John B. Jones, United States District Judge for the District of South Dakota.

lawsuit, as recorded in his deposition and affidavit.

In October 1986, Stenzel was arrested and incarcerated in the Minnehaha County Jail in Sioux Falls, South Dakota. On November 20, 1986, he appeared in court and pleaded guilty to a perjury charge and to a charge of failure to appear for sentencing following his first arrest on the perjury charge, when he fled to California "in an attempt to probably evade the law." Stenzel Deposition at 17. He was returned to the county jail to await sentencing.

Late on December 4, 1986, or early the next morning, Deputy Jim Ellis was conducting a head count of sleeping prisoners at the jail. Stenzel was sleeping completely covered with a blanket. Ellis told him twice he was to "show some skin," that is, leave some part of his body visible, or uncover part of his head while sleeping. Stenzel complied but then immediately covered himself again. Stenzel later said, when deposed, that he was sleeping completely covered because the light gave him a headache, the cell was cold, and because "there's no rule specifically stating that I couldn't sleep in any manner I choose." Stenzel Deposition at 22. Nevertheless, Stenzel, who had been in the jail before, also stated that he knew he was violating a jail policy by refusing to "show skin" and that he expected to be written up, found guilty of the violation, and confined to isolation. Stenzel Affidavit at 1.

The third time he was asked to comply with the rule to "show skin," Stenzel said that he preferred to discuss the infraction the next morning. Sergeant Pat Adams, who now accompanied Ellis, told Stenzel he would be put in isolation if he continued to sleep without "showing skin." Stenzel refused to uncover and "[m]aybe words were said after that, maybe they weren't." Stenzel Deposition at 24. Deputy Lynn Jacobs then joined Ellis and Adams, and the three jailers forcibly removed Stenzel from his bunk, pulled him by his hair, and shoved him to the floor. While Stenzel was face down on the floor, Ellis pulled back a finger of Stenzel's left hand and Adams had his knee in the small of Stenzel's back.

Stenzel was pulled to his feet and says that, in leaving the cell, "I couldn't, more or less, stabilize myself, and as a result I was smashed into the bars on the way out." Stenzel Deposition at 32. En route to isolation, Ellis choked Stenzel to the point that he could not speak. At no time during this part of the incident was Stenzel handcuffed.

Stenzel is six feet, five inches tall and, at the time of the incident, weighed approximately 220 pounds. Despite the cold, he was not wearing a shirt, and his upper body was covered with lotion given him by the jail nurse for treatment of chapped skin. He had his right hand clenched to his chest under his body. Stenzel denies resisting being taken to isolation but, he says, "It would be fair to say that I resisted pain." Stenzel Deposition at 31.

Once in isolation, Stenzel needed "urgently" to use the toilet, but he "had a problem with using the toilet in front of a woman." Stenzel Deposition at 35, 36. Each isolation cell was equipped with a camera, and Stenzel knew that women guards could monitor the activities in his cell and that the toilet was within view of the camera. Because he did not want a female guard to observe him using the facilities (although he had no idea at the time who was monitoring his cell), Stenzel dampened toilet tissue and used it to cover the camera lens. Although that gave him the privacy he desired, he did not use the toilet then because he did not believe he would have time before the jailers returned. They did in fact return, and Adams told Stenzel to remove the tissue or he would be bound; Stenzel refused and Jacobs or Adams handcuffed and chained him to his bunk, which had no mattress. Stenzel makes no claim of being beaten during the handcuffing incident: "Basically I just didn't want to get myself beat up again so I cooperated." Stenzel Deposition at 45.

Stenzel was left chained for the rest of the night. Because he refused to leave the camera lens uncovered, he was not permitted to use the toilet and he urinated in his pants. About ten the next morning, he

was given clean clothes. Stenzel was unable to eat the food he was offered that morning because of a sore throat that resulted, he believes, from the incident the previous night. Stenzel admits, however, that he did not eat even after his throat was better, for a total of six days, because he was on a hunger strike protesting his confinement in isolation. The day after the incident he was given a disciplinary hearing, found guilty of rules violations, and sentenced to an extended term in isolation. He also saw the jail nurse for the scratches, bruises, and abrasions he had sustained during the struggle the night before, but his injuries required no treatment or continued observation. On December 22, 1986, Stenzel was sentenced on the perjury and failure to appear charges, and was transferred to the South Dakota State Penitentiary.

Stenzel's original pro se 42 U.S.C. § 1983 complaint was against Adams, Ellis, and several others, and alleged violations of his constitutional rights under various amendments. The District Court dismissed all claims except those against Ellis and Adams, and Jacobs later was added as a defendant by stipulation of the parties. In an amended complaint, the previously dismissed claims and defendants reappeared, and the District Court summarily dismissed them in its order granting the defendants' motion for summary judgment. Stenzel, who is now represented by appointed counsel, does not appeal that aspect of the order.

On appeal, Stenzel claims that the court erred in dismissing his Eighth Amendment claim, which is based on the circumstances of his removal to isolation and the restraint once there, and his Fourth Amendment claim, which is based on his asserted right to use the toilet in the isolation cell unobserved by women.[2] Stenzel asserts that there remain genuine issues of material fact, thus entitling him to a trial. It is Stenzel's responsibility to make a sufficient showing to establish all the essential elements of his case. If we agree with the

District Court that he has failed to do so, the jailers are entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). We review Stenzel's Eighth and Fourth Amendment claims in turn.

Stenzel agrees with appellees that *Whitley v. Albers*, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986), states the law applicable to his Eighth Amendment claim. Appellant's Brief at 15. The action of prison officials against a prisoner will amount to the "cruel and unusual punishment" the Eighth Amendment proscribes only if the conduct can be described as "obduracy and wantonness." 475 U.S. at 319, 106 S.Ct. at 1084. Whether that standard is met, that is, whether the jailers' actions against Stenzel "inflicted unnecessary and wanton pain and suffering," 475 U.S. at 320, 106 S.Ct. at 1085, will depend upon how the incident here is characterized—whether it was a security measure taken to quell a disturbance or merely punishment.

In *Whitley*, the plaintiff, a prisoner, was shot during or shortly after a prison riot that involved prisoners taking a guard hostage. Stenzel argues that "[u]nlike *Whitley*, there was no disturbance" in this case, just his "passive resistance," Appellant's Brief at 16. We do not agree with Stenzel's assessment. Granted, this incident was not a prison riot, but then neither was Stenzel shot. We must consider the circumstances in which the defendants here acted.

When a prisoner, having been warned three times, refuses to comply with a legitimate jail security regulation, the incident has escalated into a "disturbance ... that indisputably poses significant risks to the safety of inmates and prison staff." *Whitley*, 475 U.S. at 320, 106 S.Ct. at 1085. The rule requiring prisoners to "show skin" while sleeping was put into effect to insure that prisoners were actually in their bunks during head counts. The Minnehaha County jail had relatively recent experience with escapes where prisoners used their bed

---

**2.** Presumably Stenzel intended to invoke the Fourteenth Amendment as well, so as to make the constitutional prohibitions applicable to the county jail employees.

clothes to make it appear people were in the bunks. Affidavit of Pat Adams at 1. Here, the jailers were dealing with a potential escape risk, Stenzel having previously fled the jurisdiction to avoid prosecution. When after the third warning an obstinate Stenzel flatly refused to sleep "showing skin," the jailers were justified in believing there was a significant risk to jail security if Stenzel was not removed to isolation without delay. We are not prepared to second-guess the jailers' judgment, given the "broad administrative and discretionary authority" the federal courts accord prison authorities. *Hewitt v. Helms*, 459 U.S. 460, 467, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983); *see also Tyler v. Black*, 865 F.2d 181, 184 (8th Cir.) (en banc), *cert. denied,* — U.S. ——, 109 S.Ct. 1760, 104 L.Ed.2d 196 (1989). Such deference "does not insulate from review actions taken in bad faith and for no legitimate purpose, but it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice." *Whitley*, 475 U.S. at 322, 106 S.Ct. at 1085. As we are convinced this incident was in the nature of a disturbance to which the *Whitley* standard was intended to apply, we proceed now to review the factors that determine " 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.' " 475 U.S. at 320–21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

■ The *Whitley* Court was quite specific in delineating the court's duty in cases such as this one, and in providing guidelines for discharging that duty. We "must determine whether the evidence goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives." 475 U.S. at 322, 106 S.Ct. at 1085. The factors we consider when evaluating "whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it

occur" include: the need for force; the correlation between the need for force and the amount of force used; the extent of the injury; "the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them"; and any attempt to "temper the severity" of the response. 475 U.S. at 321, 106 S.Ct. at 1085.

■ Concerning the move to isolation, Stenzel's size, his slippery upper body and failure to wear a shirt, and his fist clenched under his body all contributed to the difficulty the jailers had in moving him and the consequent need for force. Stenzel had been asked three times to uncover while sleeping and finally unequivocally refused, making it necessary for the jailers to move him forcefully. His size, slippery skin, and "passive resistance" made him awkward to move. Had the jailers simply wanted to assault Stenzel, there was no reason to make three passes by the cell and then warn him of the consequences of his behavior. Stenzel's injuries—bruises and abrasions—were minor, required no medical treatment, and caused no permanent damage. *See Cowans v. Wyrick*, 862 F.2d 697, 700 (8th Cir.1988) ("The extent of injury inflicted is ... a relevant factor as to whether or not the punishment inflicted was cruel and unusual."). The jailers' perception of the potential security risk was reasonable, considering Stenzel's size and recalcitrance, the fact that he had not been handcuffed, and his previous flight to avoid prosecution. Although the conduct Stenzel alleges may have given rise to a state law cause of action for battery, it does not rise to the level of a constitutional violation. *See Black Spotted Horse v. Else*, 767 F.2d 516, 517 (8th Cir.1985). "The infliction of pain in the course of a prison security measure ... does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." *Whitley*, 475 U.S. at 319, 106 S.Ct. at 1084; *see also Cowans*, 862 F.2d at 699 (verdict for prisoner plaintiff requires more than finding

that "use of force was not applied in a good faith effort to maintain and restore discipline").

■ Stenzel argues that an Eighth Amendment violation also resulted when he was chained to his bunk once in isolation. In this situation, as was the case when he was in his regular cell, Stenzel knew the rule regarding the camera, was reminded of it, and was advised of the consequences should he refuse to obey it. He nevertheless chose to defy the authorities. The guards needed to apply no particular force to chain Stenzel and he received no injuries from the incident, in all likelihood because he decided to cooperate. It is of no consequence that Stenzel believed the cameras in isolation were installed to monitor for suicide and that Stenzel had exhibited no suicidal tendencies. To allow prisoners to choose which jailhouse rules they will obey would result in chaos. Nor are prison officials required to acquiesce in spontaneous prisoner reformation of unpopular rules, or to decide on an ad hoc basis which rules are enforceable against which prisoners. There is nothing inhumane or wanton about enforcing reasonable prison regulations without exception, even for those prisoners who believe they know better than the jailers. Other than assigning Stenzel his own personal guard (a solution no one suggests), restraining Stenzel in the cell—which was accomplished without the use of force—was the only way to prevent him from breaking the rule once he made it clear he had no intention of obeying it.

"Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under the standard ... described, the case should not go to the jury." *Whitley*, 475 U.S. at 322, 106 S.Ct. at 1085. There is no inference, reliable or otherwise, of wantonness

on the part of the defendant jailers in either incident here. Stenzel's Eighth Amendment claims thus were properly decided on defendants' motion for summary judgment.

Stenzel also claims that the jailers violated his Fourth Amendment right to be free from unreasonable searches and seizures, although the basis for that claim is not so clear from Stenzel's statement of the issues or the one-page argument in his brief. Stenzel's brief phrases the issue as follows: "Whether or not plaintiff's Fourth Amendment right to privacy was violated when, after being forceably placed in an isolation cell, plaintiff covered a camera lens with toilet paper prior to using the toilet, was chained to his bunk when plaintiff refused to remove the toilet paper from the camera lens?" Appellant's Brief at 4–5. For the purposes of our review, we will assume that Stenzel is claiming these defendants violated his right to be free from unreasonable searches by placing him in an isolation cell where there was the possibility that female guards would observe him using the toilet.

■ It is not clear to us that the jailers here are the proper defendants for Stenzel's claim, since they have no direct responsibility for the jail conditions (female guards monitoring the isolation cells) that give rise to the alleged constitutional violations. Nevertheless, we need not decide the issue on that ground, since we hold that no Fourth Amendment violation occurred here. No one—male or female—observed Stenzel using the facilities, and Stenzel covered the lens without knowing the sex of the monitoring guard. Stenzel's Fourth Amendment rights could not have been infringed if no one viewed him using the facilities.[3]

Stenzel claims he was "humiliated" because he urinated in his clothing while

---

**3.** Even if women guards had observed Stenzel, this is a highly questionable Fourth Amendment claim. We are inclined to agree with the Ninth Circuit's opinion in *Grummett v. Rushen,* 779 F.2d 491, 495 (9th Cir.1985), a case where even more complete observation of male prisoners by female guards was possible:

Assuming, without deciding, that the [women] guards' surveillance of the inmates in their cells, in the showers, and from the play yard are "searches" for purposes of the fourth amendment, we cannot conclude, on this record, that this conduct is unreasonable and therefore prohibited by the fourth amendment.

handcuffed to his bunk. Stenzel's humiliation was no fault of the jailers. Stenzel knew *before* the jailers handcuffed him to the bunk that he had to refrain from covering the camera lens in order to use the toilet. He understood what would be required before they would release him. Stenzel Deposition at 46. His adamant refusal to uncover the lens, following close on the heels of his earlier rule violations, understandably did not dispose Stenzel's jailers to conciliation at that moment and, in all likelihood, precluded a negotiated settlement.[4] Stenzel knew his choices and the consequences of each before he chose defiance. He evidently decided that the possibility that a woman guard monitoring the cell would observe him using the toilet was more humiliating than the probability that he would wet himself and be observed by a woman guard, as in fact happened. It should also be recalled that the only reason he was in a monitored cell in the first place was because he willfully broke the rules with full knowledge of the consequences, which included transfer to a monitored cell.[5]

We affirm the District Court's grant of defendants' motion for summary judgment and the judgment of dismissal.

LAY, Chief Judge, dissenting.

This case is a rather simple one. It comes to this court on a grant of summary judgment by the district court. This means that if there exists any genuine issue of material fact that can be derived by giving the benefit of all reasonable inferences to the plaintiff, the case must be remanded. This case does not involve an attempt of guards to quell a riot, as was the case in *Whitley v. Albers*, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). Nor was there even a disturbance, until the guards entered Stenzel's cell and began brutalizing him. On the evening in question, Stenzel refused to fully comply with a prison rule

which required inmates to have some part of their bodies visible while sleeping. Stenzel testified he placed the covers over his head because the light gave him a headache and the cell was cold. The guards knew he was in his cell because he briefly uncovered himself each time they passed and told him to sleep uncovered.

Although Stenzel's reasons for refusing to follow the rule may have been sincere, his behavior violated a legitimate jail policy and the guards were seemingly justified in deciding to move Stenzel to an isolation cell. I take no issue with that decision. Stenzel's refusal to follow this rule, however, did not give cause for the deputies to physically beat him while moving him to isolation. According to the plaintiff, whose account of events on a summary judgment motion is to be given full credibility, three guards entered his cell and beat him without provocation. The three guards pulled Stenzel's hair, shoved him to the floor, pulled back a finger of his left hand causing excruciating pain, placed a knee in the small of his back, and upon getting him upright smashed his head into the cell doors. One deputy grabbed him by the throat and cut off his air supply. During this time Stenzel did not resist other than to tuck his limbs under his chest to avoid further injury and pain. (Stenzel Deposition at 28–34). On these facts, I find it incredible that the majority does not at least find that a jury question exists about whether the guards employed excessive force in violation of the Eighth Amendment.

The majority strains to find that Stenzel's refusal to fully comply with a prison rule was a disturbance justifying application of the *Whitley* standard. Stenzel was locked in his cell attempting to sleep. Stenzel's actions were not bothering other inmates nor were they in general creating any sort of disturbance. *Cf. Cowans v.*

---

**4.** At the end of Stenzel's first day in isolation, a compromise solution was reached. Stenzel was permitted to cover the camera lens while he was using the facilities, provided he uncovered it immediately when finished. Stenzel Deposition at 49–50.

**5.** Stenzel, who, as noted, had been in the Minnehaha County Jail previously, also had been in isolation in the jail before this occasion. Stenzel Deposition at 19. He therefore knew that the isolation cells were monitored when he chose to defy the jailers.

*Wyrick*, 862 F.2d 697, 701 (8th Cir.1988) (McMillian, J., specially concurring) (questioning whether refusal by inmate locked in his cell to close food door can be said to be disturbance within meaning of *Whitley*). Stenzel's refusal to sleep uncovered may have been a provocative challenge to a legitimate jail policy justifying officials in taking remedial action, but his act was not the kind of disturbance envisioned by the Supreme Court when it formulated the *Whitley* standard.

An inmate's provocative act that does not threaten jail security or order, however much it may annoy prison officials, does not justify the officials' use of excessive force against the inmate. When the use of force is in retaliation for a provocative act of an inmate, force applied by guards is "more likely to be not an effort to restore order but instead either a motive for 'maliciously' striking the [inmate] 'for the purpose of causing harm' or else summary, informal, unofficial and unsanctioned corporal punishment." *Ort v. White*, 813 F.2d 318, 324 (11th Cir.1987) (citation omitted).

*Whitley* and other cases reflect the indisputable fact that prison officials must have the ability to act quickly, sometimes with force, to quell disturbances and restore order. That force, however, must be reasonable. The license to use reasonable force carries with it the "heavy responsibility to apply that force *only* when justified, and to terminate the use of force when the justification ceases. The continued unjustified application of force amounts to physical abuse of an inmate, abuse which is prohibited by the United States Constitution." *Smith v. Dooley*, 591 F.Supp. 1157, 1172 (W.D.La.1984), *aff'd*, 778 F.2d 788 (5th Cir. 1985). Here, there is ample evidence that the use of any force may have been completely unnecessary, and that the amount of force and its duration was excessive. The Court in *Whitley* sets out a complex

set of factors that must be considered in deciding whether actions of prison officials were "wanton and obdurate."[1] That task is for the jury and can be taken away from the jury *only* if the evidence supports no reliable inference of wantonness. *Whitley*, 475 U.S. at 322, 106 S.Ct. at 1085. The majority twists the meaning of *Whitley* and its progeny to cut off Stenzel's right to present his case of cruel and unusual punishment to a jury, and in the process subverts the meaning of the Eighth Amendment.

CONCLUSION

The majority decision runs counter to this Circuit's precedent denying summary judgment on Eighth Amendment claims of cruel and unusual punishment when there is a legitimate factual dispute over the necessity and propriety of actions taken by prison officials. *See, e.g., Madewell v. Roberts*, 909 F.2d 1203, 1207 (8th Cir.1990); *Lair v. Oglesby*, 859 F.2d 605, 606 (8th Cir.1988) (per curiam); *cf. Duncan v. Storie*, 869 F.2d 1100, 1103 (8th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 152, 107 L.Ed.2d 110 (1989) (holding that whether excessive force was used in making an arrest is a factual issue for which summary judgment is inappropriate when differing account of events exists). It is a total subversion of the trial court record to hold that these facts do not make out a prima facie factual dispute of excessive force. I dissent.

---

**1.** These factors include the need for force, the correlation between the need for force and the amount of force used, the extent of the injury, the threat to the safety of the staff and inmates, and any attempt to temper the severity of the response. *Whitley*, 475 U.S. at 321, 106 S.Ct. at 1085; majority opinion at 427.