**David Allen SHELDON, Appellant,**

v.

**C/O PEZLEY,; Richard Rewis; Robert Barthomew; Maurice Huff; Eric Kirbach; Denny Manning, Appellees.**

No. 94–1374.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 15, 1994.

Decided March 6, 1995.

Bill Hefner (Student—University of Iowa, College of Law) Iowa City, IA, argued (Paul Papak, Patricia N. Acton, Ruben Nunez and James S. Shaw, on the brief), for appellant.

Kristin Wright Ensign, Asst. Atty. Gen., Des Moines, IA, argued, for appellees.

Before BEAM, Circuit Judge, FRIEDMAN *, Senior Circuit Judge, and MORRIS SHEPPARD ARNOLD, Circuit Judge.

FRIEDMAN, Senior Circuit Judge.

A state prisoner appeals from the decision of the United States District Court for the Southern District of Iowa ** dismissing after trial his complaint under 42 U.S.C. § 1983 (1988) alleging that state correctional officers subjected him to cruel and unusual punishment in violation of the Eighth Amendment. The prisoner contends that the officers used excessive force while returning him to his cell from the shower and denied him access to medical care. The district court held that the prisoner had not established either of these allegations. We affirm.

I

A. The magistrate judge, before whom the case was tried with the consent of the parties pursuant to 28 U.S.C. § 636(c) (1988), made the following findings:

On April 29, 1992, the appellant Sheldon, an inmate at the Iowa State Penitentiary, refused to leave the shower in cellhouse 220, a maximum security unit. Sheldon believed that he was entitled to more time in the shower. The officer at the shower requested assistance from the Cell Emergency Response Team (CERT), which is called upon when an inmate refuses to obey a direct order or when assistance is required to remove an inmate from a cell. The incident was videotaped, beginning with the dispatch

* DANIEL M. FRIEDMAN, of the United States Court of Appeals for the Federal Circuit, sitting by designation.

** Honorable Celeste F. Bremer, United States Magistrate Judge for the Southern District of Iowa.

**1314**

of the CERT to the shower. Like the magistrate judge, we viewed the videotape.

When the CERT, led by the appellee Lt. Rewis and including five other officers, reached the shower, handcuffs were placed on Sheldon's hands behind his back. A member of the CERT applied a "pain compliance hold,"

> which involves bending a person's wrist in a natural position, with no pressure applied. If the person refuses to comply with an order, then the wrist is bent to cause only sufficient pain to cause the person to comply with the order. All officers testified that at no time was any force applied to Sheldon, as he was complying with all of the orders issued by Lieutenant Rewis or other CERT members.

The CERT then conducted a strip search of Sheldon, who was held first with his head against a corner of the cell and then against a cell wall. A strip search "is standard procedure whenever [the CERT] take[s] an inmate from the shower to his cell." After the search was completed, the CERT returned Sheldon to his cell. The entire procedure from the time the CERT reached the shower to the return of Sheldon to his cell took approximately 20 minutes. "During this time, Sheldon was screaming in a loud voice, wailing and yelling 'you're hurting me.'"

After Sheldon was placed in his cell, Lt. Rewis asked him whether he wanted medical attention. When Sheldon said he did, Lt. Rewis twice asked Sheldon to place his arms through the food slot, and again be handcuffed, so that he could be returned to the shower, where a nurse could examine him. The nurse "needed to see Sheldon in a shower cell where there was better light and no plexiglas front to the cell." Sheldon twice refused to be handcuffed and be returned to the shower, allegedly "because his wrists were in pain, and he believed that handcuffing and further handling by CERT officers would aggravate this injury."

A nurse who had been called arrived to examine Sheldon. Lt. Rewis told her that "Sheldon had twice refused to come out of the cell for medical treatment." The nurse did not examine Sheldon, but noted that he could go on sick call at any time. Sheldon was aware that in his cellhouse sick call was available every weekday and weekends in an emergency.

Sheldon went on sick call 12 days later, on May 10, 1992, and made two follow up visits to the infirmary in May and June. Later in June a doctor in the prison health unit saw Sheldon, diagnosed him as having acute and chronic neuritis in his right wrist, and prescribed Motrin three times daily for two weeks. Sheldon had unrestricted access to Tylenol and aspirin on request, but "testified he did not use this nonprescription medication because he did not think it would be effective."

More than a year later, in July 1993, on the referral of the prison health unit, Dr. Neahring saw Sheldon at the University of Iowa Hospital and Clinic Department of Neurology. Dr. Neahring diagnosed Sheldon as having a right ulnar sensory mononeuropathy, and "recommended using nonsteroidal anti-inflammatory medication (such as Motrin or aspirin) for the occasional tingling sensation noted, which is the same treatment Sheldon had been receiving at ISP. Sheldon complains that once a month or so his hand occasionally tingles as if it had fallen asleep. He has no loss of strength or scarring. Sheldon testified that this condition did not exist prior to April 29, 1992."

B. Sheldon filed a complaint in the district court under 28 U.S.C. § 1343(a)(3) (1988), seeking compensatory and punitive damages from Lt. Rewis and the five CERT members involved. Sheldon alleged that the defendants "engaged in excessive force while removing Plaintiff and escorting him to his cell when they twisted his wrists and ankles. As a result, Plaintiff suffered extreme pain and nerve damage to his hand. Defendants also denied Plaintiff reasonable access to medical care following this assault." Sheldon further alleged that "Defendants' conduct was reckless and callously indifferent to Plaintiff's federally protected rights", and that "the assault by Defendants upon Plaintiff violates the 8th Amendment by subjecting Plaintiff to cruel and unusual punishment, and by subjecting Plaintiff to deliber-

ate indifference to his serious medical needs."

After trial, the court held for the defendants. The court found that "excessive force was not applied to Sheldon during the time period he was in the shower or moved down the range and placed in his cell. Sheldon's dramatic display for the videotape did not bolster his credibility." The court further found that "Sheldon has failed to establish that any use of force under the circumstances was excessive or applied maliciously and sadistically for the purpose of causing harm, and not applied in a good faith effort to achieve a legitimate purpose", and that

> there was no Eighth Amendment violation because there is a penological justification to the use of pain compliance holds for the safety of the inmate and the officers, and ... there is no showing that Sheldon was exposed to severe pain, or that his discomfort was caused deliberately, as punishment, or mindlessly with indifference to his humanity.

With respect to the officers' alleged failure to provide Sheldon with medical treatment, the court ruled:

> Sheldon alleges that during the cell move on April 29, 1992, Defendant Rewis was deliberately indifferent to his need for medical treatment and tacitly authorized the refusal to provide the medical treatment Sheldon requested. It is true that Lieutenant Rewis advised the nurse reporting to the scene that Sheldon had just twice declined medical treatment. However, neither Lieutenant Rewis nor other CERT officers interfered with Sheldon receiving medical treatment after that time. Sheldon was always free to recall the nurse on April 29, or to put in a sick call slip on any of the days following this altercation. In fact, Sheldon waited *twelve days* before putting in a sick call slip, and received appropriate treatment from the health care unit, including a referral to the University of Iowa Hospitals and Clinics. The treatment plan outlined by the University of Iowa was no different from that provided by ISP.
>
> Sheldon has not established that the refusal to force him out of his cell to receive treatment immediately at the time of the incident was a wanton and unnecessary infliction of pain. [emphasis in original]

Finally, the court held that the officers had qualified immunity from suit. Since we uphold the court's rulings that the officers did not use excessive force on Sheldon or deny him medical treatment, we need not consider this alternative ground of decision.

## II

The findings of the district court, most of which Sheldon does not challenge and none of which is clearly erroneous, fully support the court's conclusion that Sheldon did not establish his alleged violations of the Eighth Amendment.

■ A. To prevail on his claim that the prison officers subjected him to cruel and unusual punishment by using extensive force against him, Sheldon was required to show that the officers' conduct "can be described as 'obduracy and wantonness,'" namely, whether "the jailers' actions against [Sheldon] 'inflicted unnecessary and wanton pain and suffering.'" *Stenzel v. Ellis,* 916 F.2d 423, 426 (8th Cir.1990) (quoting *Whitley v. Albers,* 475 U.S. 312, 319–20, 106 S.Ct. 1078, 1084–85, 89 L.Ed.2d 251 (1986)). *Id.* "The question ... ultimately turns on 'whether force was applied in a good ·faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Hudson v. McMillian,* 503 U.S. 1, 6, 112 S.Ct. 995, 998, 117 L.Ed.2d 156 (1992) (quoting *Whitley,* which quoted *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied sub nom. John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)). *See Hickey v. Reeder,* 12 F.3d 754, 758 (8th Cir.1993) ("Whether pain is wantonly and unnecessarily inflicted depends, at least in part, on whether force could have plausibly been thought to be necessary to. maintain order in the institution and. to maintain the safety of the prison personnel or inmates.")

■ The gravamen of Sheldon's complaint was the use of the "pain compliance hold," which he contends subjected him to severe

pain and was unnecessary because he complied with all of the orders of the CERT. The district court found that the hold itself does not cause pain; pain occurs only when force is applied to bend the inmate's wrist. All the CERT officers who testified stated that no force was applied to Sheldon's wrists because he complied with all of the CERT orders. Although the district court did not explicitly credit that testimony and reject Sheldon's contrary testimony, that conclusion seems implicit in the finding that "there is no showing that Sheldon was exposed to severe pain" and the conclusion that "Sheldon's dramatic display for the videotape the court found that "Sheldon was aware that the incident was being videotaped" did not bolster his credibility."

Sheldon's contention that use of the pain compliance hold was unnecessary because he complied with all of the orders of the CERT is unconvincing. The CERT members not only had to strip search Sheldon, which was the customary practice when a prisoner refused to leave the shower, because prisoners frequently used the shower to transfer contraband, but also had to return him to his cell, and they had no way of knowing what he would do during that trip. The CERT was justified in taking necessary precautions to prevent any incident in this maximum security unit. According to a CERT member, the hold was for "controlling the inmate.... It's for his safety along with our safety." As in *Stenzel*, "[w]e are not prepared to second-guess the jailors' judgment, given the "broad administrative and discretionary authority" that federal courts accord prison authorities." 916 F.2d at 427, citation omitted.

The use of the pain compliance hold, particularly when no force is applied, appears less severe than the use of the "black box" that was placed over a prisoner's handcuffed wrists when he was transported outside the prison. *Moody v. Proctor*, 986 F.2d 239 (8th Cir.1993). The black box admittedly caused pain and injury to the wrists. In *Moody*, we held that such use of the black box did not constitute cruel and unusual punishment because, "although the black box causes discomfort, its use is penologically justified 'by the greater risk of escape ... and the re-

duced number of guards' " outside the prison, and the lack of any evidence that the correctional officials who used the box "acted maliciously or sadistically, or with deliberate indifference." *Id.* at 241–42 (quoting *Fulford v. King*, 692 F.2d 11, 14 (5th Cir.1982)).

The present case is unlike *Hickey v. Reeder*, 12 F.3d 754, upon which Sheldon relies. There jail officials shot a prisoner with a stun gun because he refused to sweep his cell after repeatedly being ordered to do so, and warned him the stun gun would be used unless he complied. We reversed the district court's ruling that the use of the stun gun did not constitute cruel and unusual punishment. We held that the stun gun was used not because the jail officials believed the prisoner would become violent, but "to cause enough pain and harm to force him to sweep his cell and to make an example out of him" *id.* at 758, and that it was "both an exaggerated response to Hickey's misconduct and a summary corporal punishment that violated Hickey's Eighth Amendment right to be free of cruel and unusual punishment" *id.* at 759.

Our review of the evidence in this case satisfies us that the pain compliance hold was used "to maintain order in the institution and to maintain the safety of the prison personnel or inmates," *Hickey*, 12 F.3d at 758, did not inflict "unnecessary and wanton pain and suffering," and was not used "maliciously and sadistically for the very purpose of causing harm," *Hudson*, 503 U.S. at 5, 112 S.Ct. at 998.

■ B. To sustain his contention that the officers' alleged failure to provide medical care subjected him to cruel and unusual punishment, Sheldon was required to show "deliberate indifference to [his] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). A "serious medical need" is "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious even a layperson would easily recognize the necessity for a doctor's attention." *Johnson v. Busby*, 953 F.2d 349, 351 (8th Cir.1992) (upholding jury instruction that used this language).

■ Sheldon did not make that showing. Far from being deliberately indifferent to

Sheldon's medical needs, Lt. Rewis asked Sheldon, as soon as he was returned to his cell, whether he wanted medical assistance. The only reason Sheldon did not receive such assistance at that time was because he refused to be rehandcuffed to retransfer him to the shower, where a nurse would have better light to examine him. Those were reasonable conditions to impose upon the provision of medical treatment. Sheldon stated that inmates going to the shower are handcuffed, and the nurse testified that it is "routine" to take inmates seeking medical help from their cells to the shower for better visibility. As the district court correctly pointed out, "[t]he sporadic nerve inflammation of his wrist is not a condition so obvious that even a layperson would easily recognize the necessity for a doctor's care."

Although Sheldon could have gone on sick call at any time, he waited 12 days before doing so and was then seen 4 times in the infirmary, including once by a physician. The treatment the latter prescribed was the same prescribed the following year when the prison infirmary referred Sheldon to the University of Iowa Hospital. Sheldon makes no claim that the treatment he received was improper or inadequate. He has not shown that any CERT member or anyone else in the prison was deliberately indifferent to any serious medical needs he had.

## CONCLUSION

The judgment of the district court is affirmed.