RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0260p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

NICHOLAS ROBERSON,

*Plaintiff-Appellee,*

*v.*

No. 13-1405

JAMES TORRES,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:09-cv-12927—Denise Page Hood, District Judge.

Argued: March 20, 2014

Decided and Filed: October 21, 2014

Before: BOGGS, SILER, and GIBBONS, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Michael R. Dean, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Thomas J. Rheaume, Jr., BODMAN, PLC, Detroit, Michigan, for Appellee. **ON BRIEF:** Michael R. Dean, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Thomas J. Rheaume, Jr., BODMAN, PLC, Detroit, Michigan, for Appellee.

---

**OPINION**

---

BOGGS, Circuit Judge. This is an interlocutory appeal from the denial of qualified immunity. Nicholas Roberson, a Michigan state prisoner, alleges, as relevant to this appeal, that James Torres, a former sergeant with the Michigan Department of Corrections ("MDOC"),

violated his constitutional rights.  In particular, Roberson alleges that Torres sprayed him with a chemical agent while he was sleeping, in violation of the Eighth Amendment.  The district court denied Torres qualified immunity and ruled that a genuine issue exists as to whether Roberson was in fact sleeping at the time he was sprayed and, if so, whether Torres's actions constituted excessive force. We affirm.

**I**

On March 13, 2009, while Roberson was incarcerated at a Michigan correctional facility where Torres worked as a corrections officer, Torres came to Roberson's cell and ordered Roberson to back up to the cell door to be placed in restraints.  When Roberson did not comply, Torres sprayed a chemical agent into the cell.

Torres issued Roberson a major-misconduct ticket for his failure to comply with the order.  At a subsequent misconduct hearing, Roberson claimed that he did not understand Torres's order because he was asleep when it was given and did not awaken until after Torres deployed gas into his cell.  Roberson claimed that, although he had been awake and had refused to come out of his cell earlier, "during first shift," he had subsequently fallen asleep.  The hearing investigator continued the hearing in order to obtain a response from Torres.

Another hearing officer reconvened the hearing on April 8, 2009, after reviewing the prior hearing report and the investigator's notes concerning Torres's statement.  At this second hearing, Roberson apparently requested a review of the videotaped recording of the incident. The second hearing report states:

> [Roberson] is told this hearing officer is not persuaded the sergeant gave an order when he was sleeping.  When this hearing officer continues to discuss the above, prisoner talks above her and is told in a second he will be removed if he does not stop and he then tells the officer "let's go" and leaves the hearing room.  Prisoner has voluntarily waived his right to remain at the hearing.  It is properly continued without him.

The second hearing report then concludes:

> The review is concise and persuasive.  Prisoner declined the investigator, documents and witnesses at review.  He made no comment he was sleeping at this time.  This hearing officer would not have adjourned [the earlier] hearing as he

did not reasonably cooperate with the process or investigator. Nonetheless, it was adjourned for an additional statement from the sergeant. Prisoner made no prior request for a video. His request is denied. He again did not reasonably cooperate in making this request. I find prisoner was given an order to back up to the cell food slot to be restrained. This is a valid and reasonable order. I am unconvinced the sergeant gave this order to a sleeping prisoner. I find the sergeant is clear prisoner was standing at the window looking at him, it was given from approximately three feet and prisoner made a comment about staff can't make him go on his medical run. I am convinced prisoner heard and understood the order.

Roberson brought this suit in federal district court alleging violations of his rights under the First, Eighth, and Fourteenth Amendments. Torres sought qualified immunity, but the district court denied the motion. Torres then filed this interlocutory appeal seeking review of the district court's order on two grounds. First, he argues that Roberson should have been precluded from asserting his claim. Roberson was issued a "major misconduct ticket" for disobeying Torres's order, and the hearing officer at his misconduct hearing found him guilty of the charge. Torres argues that, under *Peterson v. Johnson*, 714 F.3d 905 (6th Cir. 2013), the district court should have given preclusive effect to the hearing officer's factual determination that Roberson was awake, and that he had heard Torres's order but disobeyed it. Second, Torres argues that he would be entitled to qualified immunity even if Roberson were asleep at the time that Torres sprayed him. Roberson concedes that he was covered from head to toe in his blanket, and Torres argues that spraying Roberson under those circumstances would not have violated clearly established law. Roberson counters that Torres would not be entitled to qualified immunity if he sprayed a sleeping prisoner covered in his blanket; that the hearing officer's finding should not be given preclusive effect in this case; and that, in any event, we lack jurisdiction to entertain the preclusion question on interlocutory appeal.

## II

We address the jurisdictional issue first. On interlocutory review of the denial of qualified immunity, we may not review "a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 319–20 (1995). Rather, we must "separate an appealed order's reviewable determination (that a given set of facts violates clearly established law) from

its unreviewable determination (that an issue of fact is 'genuine')." *Id.* at 319. In a recent decision, the Supreme Court clarified that the reason that the order in *Johnson* was not immediately appealable was that "it merely decided a question of evidence sufficiency, i.e., which facts a party may, or may not, be able to prove at trial." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2019 (2014) (citations and quotation marks omitted). That is a question that "is closely related to other determinations that the trial court may be required to make at later stages of the case," and one that "appellate courts have no comparative expertise over trial courts" in resolving. *Ibid.* (citations and quotation marks omitted). On the other hand, appellate courts have jurisdiction over "legal issues." *Ibid.* Those legal issues may even include questions that would appear to touch on evidence sufficiency less directly, such as whether "an immediate appeal may be taken to challenge 'blatantly and demonstrably false' factual determinations." *Id.* at 2018 (citation omitted); *see also Scott v. Harris*, 550 U.S. 372 (2007). Thus, a court of appeals would appear to have jurisdiction over so related a question as whether the district court properly adopted the plaintiff's version of the facts for purposes of ruling on the issue of qualified immunity. *Plumhoff*, 134 S. Ct. at 2020 ("The District Court order here is not materially distinguishable from the District Court order in *Scott v. Harris*, and in that case we expressed no doubts about the jurisdiction of the Court of Appeals under § 1291.").

Roberson argues that we lack jurisdiction to decide Torres's preclusion claim. He notes that Torres's brief presents the issue as: "Did the district court err when it found there was a question of fact whether Roberson was awake and heard the order?" Appellee's Br. at 14 (citing Appellant's Br. at 2) (emphasis omitted). Roberson claims that the question falls plainly in the category of unreviewable determinations as to whether a genuine issue of fact exists.

Torres counters as follows: "[A]ppellate review is appropriate to determine whether a defendant's actions violated clearly established law. In this case the district court incorrectly determined that, as a matter of law, Roberson's version of the facts created a question of fact when, under *Peterson*, this Court holds that a hearing officer's factual determinations have preclusive effect in 42 U.S.C. § 1983 actions." Reply Br. at 3.

Applying *Johnson* has not been easy. *See Romo v. Largen*, 723 F.3d 670, 686 (6th Cir. 2013) (Sutton, J., concurring) (noting that "every circuit in the country has some decisions that

adopt my reading of [*Johnson*] and some that adopt the majority's"). Indeed, the Supreme Court in *Johnson* recognized that appellate courts would sometimes have "great difficulty" in separating reviewable from non-reviewable issues on interlocutory appeal. *Johnson*, 515 U.S. at 319. But the Court in *Johnson* offered the following general guidance: "interlocutory appeals of qualified immunity matters" should be limited "to cases presenting more abstract issues of law." *Id.* at 317 (quotation marks omitted). The Court emphasized, in contrast, that appellate courts should not engage, on interlocutory appeal, with issues concerning "the existence, or nonexistence, of a triable issue of fact," since appellate review is "less likely to bring important error-correcting benefits here than where purely legal matters are at issue"; is apt to "consume inordinate amounts of appellate time" in reviewing a "vast pretrial record"; and is likely to be premature since the court "may well be faced with approximately the same factual issue again, after trial." *Id.* at 316. And although the line between legal and factual issues remains somewhat ambiguous, the Court's recent decision in *Plumhoff* appears to cabin the reach of *Johnson* to "purely factual issues that the trial court might confront if the case were tried." 134 S. Ct. at 2019.

The question here is whether the preclusion issue in this case is a "more abstract issue of law," as opposed to an issue requiring an in-depth review of the same facts in the pretrial record that go to the merits of the plaintiff's claim. Torres essentially claims that, as a matter of law, factual findings of a hearing officer at a Michigan major-misconduct hearing are entitled to preclusive effect under *Peterson*. Torres does not, in this appeal, dispute the intrinsic character and strength of the evidence in the record in support of Roberson's version of events. Nor does he claim that the evidence undermining Roberson's version of events is so great that there is no genuine issue of fact for trial. In other words, he does not ask us to review the evidence in the record in order to assess its sufficiency. Rather, Torres argues that, even if Roberson's claim, as an original matter, has sufficient support in the record, Roberson is legally precluded from asserting it.

We hold that Torres's preclusion argument is "*conceptually distinct* from the merits of the plaintiff's claim that his rights have been violated." *See Johnson*, 515 U.S. at 312 (citations

and quotation marks omitted).   Accordingly, we hold that we have jurisdiction to decide the question presented.

**III**

**A**

As the Supreme Court held in *University of Tennessee v. Elliott*, "when a state agency acting in a judicial capacity resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agency's factfinding . . . the same preclusive effect to which it would be entitled in the State's courts." 478 U.S. 788, 799 (1986) (citations and quotation and alteration marks omitted).   *Elliott* identified "four criteria for, in the context of a § 1983 case, according preclusive effect to a state administrative agency's unreviewed factual determination."   *Peterson*, 714 F.3d at 912.   In *Peterson*, we applied those criteria to determine the preclusive effect of factual findings of major-misconduct hearings in Michigan prisons.

The first *Elliott* factor requires that the state agency act in a judicial capacity.   We held in *Peterson* that Michigan major-misconduct hearings meet this requirement, since the hearing officer considers evidence from both parties, allows both parties to argue their versions of the facts at a formal hearing, and issues a written final decision that is subject to direct review in state court.   *Ibid.*   The second factor asks whether the hearing officer "resolved a disputed issue of fact that was properly before [him]," and the court found that, in Peterson's case, the second factor was satisfied.   *Id.* at 913 (quotation marks and alterations omitted).   The third factor asks whether the party to be precluded had an "adequate opportunity to litigate" the factual dispute. *Ibid.*   The court found that this factor was satisfied, given the "plethora of statutory protections" and ultimate right of appeal available to the prisoner.   *Ibid.*

The fourth and final factor "provides that if the prior three are satisfied, then we must give the agency's finding of fact the same preclusive effect it would be given in state courts." *Ibid.*   As the *Peterson* court explained,

> The test Michigan courts apply when deciding whether to give preclusive effect to
> an agency's factual determination proceeds in two stages and tracks several of the
> *Elliott* factors.   The first stage applies to all cases where preclusion is claimed,

and asks whether: (1) a question of fact essential to the judgment was actually litigated and determined by a valid and final judgment; (2) the parties had a full and fair opportunity to litigate the issue; and (3) there is mutuality of estoppel. The next stage applies only to parties seeking to preclude litigation on a factual issue that was decided by an administrative agency. It asks whether: (1) the administrative decision was adjudicatory in nature; (2) there was a right to appeal from the decision; and (3) the legislature intended to make the decision final absent an appeal.

*Id.* at 914 (citations omitted).

The court observed that some of the Michigan factors overlapped with the *Elliott* factors and were satisfied for the same reasons—e.g., the decision was adjudicatory in nature and there was a right to appeal. The court also found that there was mutuality of estoppel—i.e., the parties to the misconduct hearing were the same as the parties to the litigation. Similarly, the court found that a question of fact essential to the judgment was actually litigated, since the charge was "submitted to the hearing officer for resolution, and it was resolved." *Ibid.* And it found that, "by statute, this resolution was a valid and final one." *Ibid.* Finally, the court considered the only remaining factor—whether the parties had a full and fair opportunity to litigate the issue. The court concluded that "Peterson had incentive to vigorously contest" the officer's account, in part because Peterson risked 30 days' detention, and that he did so, calling witnesses, submitting affidavits, and moving to disqualify the hearing officer for bias. *Id.* at 915–16. The court so concluded despite the fact that Peterson did not have access to counsel and was not allowed to view the videotape of the incident, where the hearing officer did review the tape, which was withheld for security reasons, and "the hearing officer gave Peterson a detailed description of what the video depicted, down to the time-stamped second of each relevant recorded activity." *Ibid.* Since the Michigan courts' test was satisfied, the *Peterson* court accorded the hearing officer's factual determination preclusive effect.

**B**

To the extent that Torres argues that, in light of *Peterson*, any factual findings by a hearing officer in a major-misconduct hearing in a Michigan prison are to be accorded preclusive effect, we reject such a reading of *Peterson* as overbroad. *Peterson* is not a blanket blessing on every factual finding in a major-misconduct hearing. Although the language of our opinion in

*Peterson* is at times categorical, our decision to accord preclusive effect to particular findings from Peterson's prison hearing necessarily turned, at least in part, on the particular circumstances of Peterson's case. Indeed, the question of preclusion cannot be resolved categorically, as it turns on case-specific factual questions such as what issues were actually litigated and decided, and whether the party to be precluded had sufficient incentives to litigate those issues and a full and fair opportunity to do so—not just in theory, but in practice. *Id.* at 916-17. It likewise turns on the court's "sense of justice and equity," *Blonder-Tongue Labs., v. Univ. of Ill. Found.,* 402 U.S. 313, 334 (1971), which may require a case-by-case analysis of surrounding circumstances.

To the extent that Torres argues that, based on the facts of this case in particular, Roberson should be precluded from re-litigating the factual claim that he asserts, the record has not been adequately developed for us to resolve that question. The parties did not raise the question of preclusion before the district court, and the court did not address it. Torres's failure to raise the argument may be explained by the fact that *Peterson* was not decided until after the district court's decision below. But that does not excuse the failure, since, although existing precedent did not lend support to Torres's argument, neither did it undermine it. Roberson, in turn, does not appear to claim that the argument was forfeited for failure to raise it below. He does, however, question whether the hearing officer's factual findings would be entitled to preclusive effect in this case. Whereas Torres would like us to resolve the question of preclusion on this appeal, Roberson argues that it ought to be addressed by the district court in the first instance. Although the pretrial record contains some relevant evidence, it has not been sufficiently developed and briefed for us to decide the question at this stage. We thus decline to decide the preclusion question and remand the case to the district court to consider the merits of the preclusion argument.

On remand, the district court should give particular attention to the fairness and accuracy of the factual findings made by the major-misconduct hearing officer. Numerous inquiries may be relevant to the district court's analysis, including why the hearing officer refused to review the alleged video of the incident, whether the hearing officer provided a sufficient and reasonable

basis for her factual findings, and whether the testimony of other witnesses corroborated the accounts provided by either Roberson or Torres.

**IV**

We turn to Torres's final argument on appeal.  Torres argues that, even accepting Roberson's version of events as true, spraying a sleeping inmate with a chemical agent, where that inmate was covered from head to toe by his blanket, would not have violated clearly established law.  We have jurisdiction over this question on interlocutory review because it asks whether the facts, as alleged, indicate a violation of clearly established law, such that the denial of qualified immunity was appropriate. *Mitchell v. Forsyth,* 472 U.S. 511, 530 (1985) ("we hold that a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable final decision . . . notwithstanding the absence of a final judgment.") (quotation marks omitted).

Qualified immunity shields an officer from suit when he or she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances that the officer confronted. *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).  Whether an officer acted reasonably must be decided "in light of the specific context of the case, not as a broad general proposition." *Ibid.* (citations and quotation marks omitted).  "In determining whether qualified immunity applies, the court employs a two-part test, asking (1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009) (citations and quotation and alteration marks omitted).

Corrections officers do not violate a prisoner's Eighth Amendment rights when they apply force "in a good-faith effort to maintain or restore discipline." *Jennings v. Mitchell*, 93 F. App'x 723, 725 (6th Cir. 2004).  We found no Eighth Amendment violation where a prisoner was sprayed with pepper spray after repeatedly disobeying orders to exit the shower. *Ibid.* ("The videotape squarely demonstrates that Jennings disobeyed repeated direct orders prior to the use of pepper spray.").  Indeed, in numerous other cases we have likewise concluded that "the use of . . . chemical agents against recalcitrant prisoners" did not violate the Eighth Amendment. *Caldwell v. Moore*, 968 F.2d 595, 600 (6th Cir. 1992) (collecting cases).  On the other hand,

"when prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). In *Williams v. Curtin*, 631 F.3d 380, 384 (6th Cir. 2011), we held that a prisoner stated a valid excessive-force claim when he "allege[d] that, when instructed to 'pack up,' he inquired, 'What for, sir?,' at which point an 'assault team' entered the cell and used a chemical agent on him."

Here, Torres claims that, if Roberson was covered by his blanket, Torres "would have had no way to determine if Roberson was actually asleep, or simply feigning sleep in order to lure officers into his cell with the intent of assaulting them." Def.'s Br. at 14. Torres notes that some courts have held that "physical confrontations are less safe than using tear gas or mace because of the greater risk of injury to staff, the inmate, or both." *Id.* at 15 (citing *Ogle v. Thompson*, No. 05-289, 2006 WL 416246, at *4 (W.D. Mich. Feb. 17, 2006)). He concludes that "it is not at all apparent under current case law that any use of [a] chemical agent is an obvious violation" of clearly established law. *Id.* at 18.

We reject Torres's argument. Roberson claims that the use of a chemical agent was unjustified under the circumstances since it was not necessary in order to restore order and since "less intrusive means" could have been used to wake him. Pl.'s Br. at 22 n.5. Accepting Roberson's version of the facts and drawing all reasonable inferences in his favor, we agree. In his defense, Torres cites an Eighth Circuit case authorizing the use of physical force where the inmate completely covered himself in his blanket. *See* Def.'s Br. at 38 (citing *Stenzel v. Ellis*, 916 F.2d 423, 427 (8th Cir. 1990). But in that case, the prisoner had "been warned three times" not to sleep that way. *Stenzel*, 916 F.2d at 426. "When after the third warning an obstinate Stenzel flatly refused to sleep 'showing skin,' the jailers were justified in believing there was a significant risk to jail security if Stenzel was not removed to isolation without delay." *Id.* at 427. Here, there is no indication in the record that Roberson had been warned not to cover himself fully while he slept. Torres again presupposes that Roberson "disobeyed . . . direct orders," Reply Br. at 19, but that assumption cannot support an argument that the use of the chemical agent would not have violated clearly established law even in the absence of disobedience. Although the use of a chemical spray may be preferable to a physical altercation under certain circumstances, we reject the false dichotomy that Torres poses: Torres undoubtedly had other

means of waking Roberson at his disposal—or at least of reasonably assuring that he was awake—before having to resort to either a chemical agent or physical force. For example, as Roberson notes, "the officer could have used a PA system, an air horn, or simply banged on the cell door with a baton." Pl.'s Br. at 22 n.5. Under the circumstances as alleged, we hold that spraying a sleeping prisoner with a chemical agent was unreasonable.

The next question is whether doing so would have violated clearly established law. On the one hand, in *Williams*, discussed above, we held that the prisoner stated an Eighth Amendment claim for excessive use of force when an officer allegedly sprayed him with a chemical agent after he asked why he needed to pack up his belongings. 631 F.3d at 384. Here, under the facts as alleged, Roberson did not even question Torres's order since he was asleep. Thus, Torres's alleged conduct would have violated clearly established law under *Williams*. On the other hand, Roberson admitted at the misconduct hearing that he refused to comply with Torres's original order "at first shift." As mentioned, it is unclear what time this first refusal occurred, but presumably "first shift" was earlier that day. As a theoretical matter, spraying a chemical agent upon a sleeping prisoner might not violate clearly established law where the corrections officer, under the circumstances, reasonably believed that the prisoner was in fact awake but disobeying the order. But that is not Torres's claim here, nor does Roberson concede such a reasonable belief on Torres's part. We are required to "take, as given, the facts that the district court assumed when it denied summary judgment." *Johnson*, 515 U.S. at 319. On those facts, we agree that using a chemical agent in an initial attempt to wake a sleeping prisoner, without apparent necessity and in the absence of mitigating circumstances, violates clearly established law.

**V**

The district court's denial of qualified immunity is AFFIRMED.